**BARTLETT FRAZIER CO. et al. v. HYDE,**
Secretary of Agriculture, et al.
No. 4833.

Circuit Court of Appeals, Seventh Circuit.
June 5, 1933.

E. R. Morrison, of Kansas City, Mo., and Frederic Ullmann, of Chicago, Ill., for appellants.

John Lord O'Brian, Asst. to Atty. Gen., and Wendell Berge, Sp. Asst. to Atty. Gen., Dwight H. Green, U. S. Atty., of Chicago, Ill., for appellees Hyde and Fitz.

Weymouth Kirkland, of Chicago, Ill., for appellee Board of Trade of City of Chicago.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

The appellants are Bartlett Frazier Company, grain dealers, who· are members of and trading upon the Board of Trade of Chicago in cash grain and grains for future delivery, and the similarly situated interveners asking the same relief. The appellees are Arthur M. Hyde, who was Secretary of Agriculture, L. A. Fitz, who was Grain Exchange Supervisor at Chicago for the Department of Agriculture, and the Board of Trade of Chicago.

The suit was brought by Bartlett Frazier Company to enjoin the defendants from requiring the plaintiffs therein, and others similarly situated, to file certain reports relative to future trading transactions, and to subject to inspection their books and records as authorized by the Grain Futures Act of September 21, 1922 (7 USCA §§ 1–17), and the regulations thereunder of the Department of Agriculture, on the ground that the act, or some of its parts, is unconstitutional.

While the opinion of Judge Wilkerson in the District Court, as reported in 56 F.(2d) 245, has our approval, we will submit some further discussion bearing on some of the propositions specially stressed on the appeal.

The contentions of appellants, as stated in the summary of their brief, are: (1) The acts of the defendants, Hyde and Fitz, in searching the records and books of plaintiffs and requiring reports of their contents violate the Fourth Amendment to the Federal Constitution; (2) the (Grain Futures) act is unconstitutional in that no notice of hearing or opportunity to be heard is afforded by its terms; (3) the act is unconstitutional in that no provision is made for testing the validity of orders, regulations, or requirements of the act, except under harsh and confiscatory penalties; (4) the act is unconstitutional in that no review of the validity of orders, regulations, or demands is afforded by its terms; (5) the act is unconstitutional in that it contains no provision for suspension of orders or for supersedeas pending test of validity; (6) the penalty provisions of the act are invalid because the offenses are so indefinite.

The constitutionality of the Grain Futures Act as a whole was definitely declared by the Supreme Court in Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839, and so those allegations and assertions attacking the constitutionality of the act as a whole must here fail.

Appellants invoke the Fourth Amendment as a shield against the requirement that they subject their books and records to the inspection of the Department, and the making of the reports. The Amendment, which declares the right of the people to be secure in their persons and papers against unreasonable search, cannot be applied to regulations which require reports and dis-

closures in respect to a business which is affected with a public interest, so far as such disclosures may be reasonably necessary for the due protection of the public. Were it otherwise, railroads and public utilities generally could not be required to make reports or to subject their records to inspection by agents of the government. Indeed, where public interest requires it, the right of visitation and disclosure has been extended even to business not charged with a public interest, as witness the taxing power, where the requirement of income reports and the right to inspect private books and papers have been definitely upheld. United States v. First National Bank of Mobile (D. C.) 295 F. 142, affirmed 267 U. S. 576, 45 S. Ct. 231, 69 L. Ed. 796 (where further authority is cited). In the Olsen Case it was said: "The Board of Trade conducts a business which is affected with a public interest and is, therefore, subject to reasonable regulation in the public interest." Page 40 of 262 U. S., 43 S. Ct. 470, 478, 67 L. Ed. 839.

The contention that through the reports and inspections appellants' business secrets and customers are more likely to disclosure, with the consequent tendency to injure appellants, cannot prevail against the paramount public interest requiring this control for the efficient exercise of which the disclosures through reports and right of inspection are quite indispensable. The statute (section 8 [7 USCA § 12]) forbids the revealing by the Secretary and his assistants of individual trades and of customers; and the findings here, predicated on the evidence, show that in the decade of experience since the act became operative no instances appear where any such confidence has been violated, or where appellants, or any other traders on the Board, have suffered from any such cause. No such official misconduct appears from the evidence to have been threatened or to be imminent.

It is argued that, because under the law inspections may be made and reports required where there is no charge, suggestion, or intimation of conduct contrary to the law, the act is unreasonable and void. It does not appear that appellants were charged with, or were suspected of, any transgression of the law. Assuming that by the declared statutory purpose of preventing corners and speculation in grains the public interest is subserved, this purpose would be seriously embarrassed if the government were powerless to require the information without regard to whether traders such as appellants were suspected of, or charged with, breaking the law. Indeed, the very requirement of the information would of itself have tendency to discourage the unlawful manipulations at which the act is aimed.

The suggestion that inspection of the books would cause disturbance among appellants' employees, and that certain of the required reports would incur considerable expense in their preparation, are too trivial to merit serious consideration when weighed against the wise public policy manifested by the act. It might here be stated that the evidence discloses but very few instances where there have been inspections. The general requirement is that the reports be made, and this, being the usual practice in the business, could not have tendency to demoralize the working force.

▪ The contention that by requiring these reports and permitting these inspections without first giving opportunity to be heard is violative of the constitutional "due process" provision (Const. Amend. 5) does not appeal to us. The public interest with which this business is impressed, and the evils at which the legislation is directed, well justify the statutory provisions for inspection and reports without first requiring a hearing in each case, and a finding that there has been such conduct as gives reasonable ground for making the inspection or requiring the reports.

Without the unqualified duty to report and the untrammeled right of inspection, the efficacy of the act would be unduly restricted; and if these features transgressed the Constitution, it is not conceivable that the constitutionality of the act would have been upheld as it was in the Olsen Case.

It is urged for appellants, as a major proposition in the case, that the severity of the penalties, civil and criminal, imposed by the act upon violators thereof, is such that no one may with reasonable safety undertake a test in the courts of its validity by refusing to obey the act, except at risk of confiscation of his property and deprivation of his liberty in the event that he fails to sustain his contest; and that thereby the courts are, in effect, closed against contesting the validity of the act.

In support of this contention the case of Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, is earnestly urged, as well as Missouri Pacific Ry. Co. v. Tucker, 230 U. S. 340, 33 S. Ct. 961, 57 L. Ed. 1507, and Oklahoma Operating Co. v. Love, 252 U. S. 331,

40 S. Ct. 338, 64 L. Ed. 596, which followed it, involving in effect the same principle. In Ex parte Young there was involved an order by state authorities requiring a public utility to put into immediate effect a substantial reduction in its rates, under severe statutory penalties in case of refusal to comply. The Young Case indicates that instances where rate reductions are involved are sui generis. We quote from pages 147 and 148 of 209 U. S., 28 S. Ct. 441, 448, 52 L. Ed. 714: "If the law be such as to make the decision of the legislature or of a commission conclusive as to the sufficiency of the rates, this court has held such a law to be unconstitutional. Chicago, etc., Railway Co. v. Minnesota, 134 U. S. 418 [10 S. Ct. 462, 33 L. Ed. 970], supra. A law which indirectly accomplishes a like result by imposing such conditions upon the right to appeal for judicial relief as works an abandonment of the right rather than face the conditions upon which it is offered or may be obtained, is also unconstitutional. It may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights. * * * Ordinarily a law creating offenses in the nature of misdemeanors or felonies relates to a subject over which the jurisdiction of the legislature is complete in any event. In the case, however, of the establishment of certain rates without any hearing, the validity of such rates necessarily depends upon whether they are high enough to permit at least some return upon the investment (how much it is not now necessary to state), and an inquiry as to that fact is a proper subject of judicial investigation. If it turns out that the rates are too low for that purpose, then they are illegal. Now, to impose upon a party interested the burden of obtaining a judicial decision of such a question (no prior hearing having ever been given) only upon the condition that if unsuccessful he must suffer imprisonment and pay fines, as provided in these acts, is, in effect, to close up all approaches to the courts, and thus prevent any hearing upon the question whether the rates as provided by the acts are not too low, and therefore invalid. The distinction is obvious between a case where the validity of the act depends upon the existence of a fact which can be determined only after investigation of a very complicated and technical character, and the ordinary case of a

statute upon a subject requiring no such investigation, and over which the jurisdiction of the legislature is complete in any event."

The plain inference is that the rule so announced applies only to cases where, by compliance with a rate-reduction order pending judicial contest of the validity of the order, the contestant would, in case of success, nevertheless suffer confiscation and unrecoverable loss of property through having collected during the period of contest only the unlawfully reduced rate. This was even more definitely pointed out in a paragraph on page 163 of the opinion in 209 U. S., 28 S. Ct. 441, 455, 52 L. Ed. 714: "It is further objected that there is a plain and adequate remedy at law open to the complainants, and that a court of equity, therefore, has no jurisdiction in such case. It has been suggested that the proper way to test the constitutionality of the act is to disobey it, at least once, after which the company might obey the act pending subsequent proceedings to test its validity. But in the event of a single violation the prosecutor might not avail himself of the opportunity to make the test, as obedience to the law was thereafter continued, and he might think it unnecessary to start an inquiry. If, however, he should do so while the company was thereafter obeying the law, several years might elapse before there was a final determination of the question, and if it should be determined that the law was invalid, the property of the company would have been taken during that time without due process of law, and there would be no possibility of its recovery."

There is nothing in the instant case in any way analogous to an order for a rate reduction. The Grain Futures Act (7 USCA §§ 1–17) does not, by authorizing inspections to be made and requiring reports of transactions of members made on the contract market, reduce their business, decrease their fees or emoluments, nor subject them to inconvenience or expense beyond the comparatively negligible cost and trouble of making the reports. The provisions attacked have no bearing on rates or prices or property. They specify only the means and conduct which Congress declared necessary in order to make the act effective. And so compliance with the law, by making the reports and permitting the inspection during such time as the member may be contesting the validity of these requirements, could not in any event involve confiscation or loss of property.

This very record shows that appellants may yield obedience to the law contempora-

neously with contesting its validity without thereby subjecting themselves to actual or potential property loss. The bill herein alleges complainants' compliance with the act since its passage in 1922. The bill was filed in 1930. No injunction pendente lite was asked or granted. If the assailed provisions of the act are sustained, appellants will doubtless continue to make reports and submit to inspection. If the attack ultimately succeeds, the reports and inspections will cease. In either case there can be no loss of property or of liberty, and Ex parte Young and the cases which follow it do not here apply.

It is urged that the statute makes use of the term "manipulation" without defining what is meant by it, and that for this reason the statute is void. If there were merit in this suggestion it would seem that in the Olsen case the court would not have failed to discover it. In several instances the opinion employs the word "manipulation":

" * * * the act only purports to regulate interstate commerce and sales of grain for future delivery on boards of trade because it finds that by *manipulation* they have become a constantly recurring burden and obstruction to that commerce." (Page 32 of 262 U. S., 43 S. Ct. 470, 476, 67 L. Ed. 839.)

"It is clear from the citations, in the statement of the case, of evidence before committees of investigation as to *manipulations* of the futures market and their effect, that we would be unwarranted in rejecting the finding of Congress as unreasonable, and that in our inquiry as to the validity of this legislation we must accept the view that such *manipulation* does work to the detriment of producers, consumers, shippers and legitimate dealers in interstate commerce in grain and that it is a real abuse." (Page 37 of 262 U. S., 43 S. Ct. 470, 477, 67 L. Ed. 839.)

Again, on pages 39 and 40 of 262 U. S., 43 S. Ct. 470, 478, 67 L. Ed. 839, it is said: "A futures market lends itself to such *manipulation* much more readily than a cash market. * * * If a corner and the enhancement of prices produced by buying futures directly burden interstate commerce in the article whose price is enhanced, it would seem to follow that *manipulations* of futures which unduly depress prices of grain in interstate commerce and directly influence consignment in that commerce are equally direct. * * * By reason and authority, therefore, in determining the validity of this act, we are prevented from questioning the conclusion of Congress that *manipulation* of the market for futures on the Chicago Board of Trade may, and from time to time does, directly burden and obstruct commerce between the states in grain, and that it recurs and is a constantly possible danger."

Even if we were disposed to attribute to the term undue uncertainty or indefiniteness, Chicago Board of Trade v. Olsen would forbid.

As to the omission of section 6 (a) [7 USCA § 8] to provide for supersedeas or for suspension of penalty pending judicial appeal from penalizing orders of the Commission, it may be said that the instant proceeding to enjoin the examination of appellants' books and the requirement of reports is not concerned with the matter of penalties. In any event, in case of appeal from any order of the Commission imposing a penalty, the right to grant supersedeas or suspension of penalty, pending the hearing by the court, is undoubtedly within the court's power.

Perceiving no reason why the decree of the District Court should be disturbed, it is affirmed.