## BOARD OF TRADE OF CITY OF CHICAGO v. WALLACE, Secretary of Agriculture, et al.

### No. 4817.

Circuit Court of Appeals, Seventh Circuit.

Oct. 31, 1933.

suspending for sixty days the designation by the Secretary of Agriculture, pursuant to said act, of the Board of Trade as a "contract market."

The basis for the suspension was the refusal to admit Farmers National Grain Corporation to membership in the Board of Trade Clearing Corporation, in alleged violation of section 5 (e) of the Grain Futures Act (7 USCA § 7 (e).

The Farmers National Grain Corporation filed with the Secretary of Agriculture, on April 8, 1932, a complaint against the Board of Trade, charging that the board and its affiliated corporation, the Board of Trade Clearing Corporation, were threatening to exclude Farmers National from the privilege of clearing its future grain trades made on the board, in that the board had threatened to expel from its membership the Updike Grain Company, which, as the wholly owned subsidiary of Farmers National, and a member of the Board of Trade and of the clearing corporation, had theretofore cleared Farmers National's trades made on the board.

On April 14 Farmers National filed its supplemental complaint, charging that its application to the clearing corporation for membership and the privilege of clearing in its own name through the clearing corporation its trades in grain upon the Board of Trade had been unlawfully denied, and requesting that the commission order the board to grant it membership in the clearing corporation for clearing its trades. Notice of the complaint and supplemental complaint was given to the board and the clearing corporation, which duly filed their answers. It was stipulated that the hearing before the commission should proceed upon the supplemental complaint alone, and evidence thereon was heard.

Farmers National is a Delaware corporation, organized and licensed to do business in

Weymouth Kirkland, of Chicago, Ill., for appellant.

John Lord O'Brian, of Washington, D. C., for appellees.

Carl Meyer, of Chicago, Ill., for intervening appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

The Board of Trade of the City of Chicago appeals from an order of the commission, constituted under section 6 (a) of the Grain Futures Act of September 21, 1922 (42 Stat. 998; 7 U. S. C. § 1 et seq. [7 USCA § 8]), Illinois. Its charter provides that only co-operative associations dealing in cash grain, and which comply with the requirements of the Capper-Volstead Act (7 U. S. C. §§ 291, 292 [7 USCA §§ 291, 292]), may hold its stock, and that individuals may not be stockholders. Its by-laws restrain it from dealing in the products of nonstockholders to an amount greater in value than such as are handled by it for stockholders; and they specify that dividends on its stock shall not exceed 8 per cent. of its par value, and that net profits beyond dividends or for establishing a reserve shall be distributed among its stockholders upon a patronage basis. The charter of Farmers National empowers it to

deal generally in grain, by itself or through subsidiaries, and to act as agent or broker for others.

Farmers National had exercised privileges of board membership through the registration, in the name of the corporation, of two of its officers who were members of the board; but this registry alone did not, under the board and the clearing corporation rules, give it the right to clear its trades through the clearing corporation.

The Board of Trade is an Illinois corporation, and since May 3, 1923, has been a "contract market" under the designation of the Secretary of Agriculture made pursuant to the Grain Futures Act, which act prescribed that the "designation is subject hereafter to suspension or revocation in accordance with the provisions of said Act."

The Board of Trade Clearing Corporation was organized in Delaware in 1925, succeeding the old clearing house which theretofore existed within the board. The clearing corporation was organized and exists solely to supply the requisite facilities for clearing trades made on the Board of Trade. It has no function but to clear such trades as are made on the board.

Farmers National had acquired entire ownership of the Updike Grain Company, a board member which was also a member of the clearing corporation. Through this subsidiary Farmers National's trades on the board were cleared until, upon charges filed against Updike Grain Company, · the latter was suspended from membership, and Farmers National could no longer so clear its trades without payment of one-eighth of a cent per bushel charged to nonmembers of the board for clearing.

On April 11 Farmers National made application to the clearing corporation for admission to membership, tendering its check for $34,755.72 in payment for twelve shares of stock in the clearing corporation, and offering to abide by all its lawful rules. The following day Farmers National was notified in writing by the clearing corporation that its board of governors had unanimously decided that Farmers National was not qualified for membership in the clearing·corporation, and its application was accordingly denied and the tendered check and other papers returned. Thereupon, on April 14, the supplemental petition was filed with the Secretary of Agriculture with a view to requiring Farmers National to be admitted to membership in the clearing corporation.

■ For the board it is initially contended that the proceedings before the commission, and its order, were premature. It seems that on April 18 Farmers National made demand upon the board to rescind, or cause to be rescinded, the action of the clearing corporation in denying Farmers National's application for membership therein, and that the board thereupon constituted a committee from its own directors and from the governors of the clearing corporation to consider this demand; that various times were set for the presentation of facts bearing on the question of the eligibility of Farmers National for such membership, and that from time to time officers of Farmers National were in attendance and agreed to supply requested data, but that such were never in fact supplied up to the time of the hearing before the commission, nor up to the making of the commission's order which is under review. The contention is that this proceeding should not have been prosecuted nor the order entered until that committee of the board and the clearing corporation had heard and determined the demand for rescission of the order of the clearing corporation denying the application for membership of Farmers National.

It appears from the evidence that the stated ground upon which the requested membership was denied by the clearing corporation was ineligibility of Farmers National under rule 313 of the board, which rule denies to Farmers National membership in the clearing corporation for the reason alone that it was not such a member thereof prior to April 2, 1929, the date fixed by that rule.

Appellant further contends that Farmers National cannot comply with the board's regulations 1060 and 1061, which specify that in order to register a corporation for trading upon the board the registry must be by two of its officers *who must be members of the board and active executive officers of the corporation, and each in his own right a substantial stockholder in the corporation.*

True it is that Farmers National could not in any event comply with these regulations of the board, since it had no individual stockholders.

Appellant further insists that Farmers National is barred from membership in the clearing corporation by its rule 39. This rule specifies as a qualification for corporate stockholders therein that they must be "(c) Registered corporations qualified to trade in their own names under the rules of the Association (Board of Trade)." This provision prescribes for corporate stockholders of clearing

corporation all the limitations and disqualifications that are applicable to corporate membership in or registry on the board itself.

But section 5 (e) of the Grain Futures Act of 1922 specifies that the Secretary of Agriculture may designate any board of trade as a "contract market" only when the governing board thereof does not exclude from membership in and privileges on such board of trade any duly authorized representative of any lawfully formed and conducted co-operative association of producers which is engaged in cash grain business, etc., and has adequate financial responsibility.

It is thus evident that so long as board rules and regulations 313, 1060, and 1061 and clearing corporation rule 39 stand, Farmers National cannot qualify for membership in the board or in clearing corporation.

Farmers National having been denied membership by reason of alleged absolute disqualification, it then had the right to invoke, for such relief to which it might be entitled, the procedure specified in the Grain Futures Act. When it did so, the subsequent request to the board for cancellation of the clearing corporation's order of denial of membership was merely a further undertaking for attaining the same end, and imposed on Farmers National no duty to prosecute such request to a conclusion or to await its outcome before proceeding with its complaint before the commission, and did not interfere with the right of the commission to hear and act upon the complaint.

In the face of these contentions of appellant of the absolute disqualification of Farmers National for contract market privileges which it sought, we believe appellant should not be permitted to take refuge behind that part of rule 39 which specifies that applicants for stock in the clearing corporation must have the requisite business integrity and financial responsibility, to determine which the board shall have exclusive power and may examine books and papers bearing thereon.

Under the indicated circumstances the commission was not required to await the outcome of such investigation, but might itself investigate and pass upon the qualifications of Farmers National essential to entitle it to the full market privileges it sought. In our judgment the hearing and order of the commission were not premature.

■ Appellant contends that Farmers National is not such an entity as is, under section 5 (e) of the Grain Futures Act, entitled to membership in and full privileges of this contract market. The contention is that Farmers National is not "a cooperative association of producers," but is at best an association of such associations and not covered by the act.

The specific inhibition upon a board of trade designated as a contract market is against exclusion from membership and privileges of "any duly authorized *representative* of any * * * cooperative association of producers * * *." It does not specify whether such representative shall be individual or corporate, and we believe that an association of producer-cooperatives into a corporation for representing them, wherein only the associating co-operatives are stockholders, is entirely within the purview and scheme of the act; and, indeed, this seems to be a very feasible and practical plan whereby the act may be made effective. Furthermore, the Capper-Volstead Act (section 1 [7 USCA § 291]), in authorizing co-operatives, states that "Such associations may have marketing agencies in common."

It is fairly to be gathered from the record that the stockholders of Farmers National are all co-operative associations of producers, of which Farmers National is the duly authorized representative or marketing agency, and is lawfully entitled to invoke in its own name, but for the sole benefit of its constituent co-operatives, such relief as the constituents might jointly or severally have invoked on their own behalf, though probably not so effectively as could this single or common marketing agency or representative acting on behalf of many associations.

The Federal Farm Board, constituted by the Agricultural Marketing Act to administer its functions, and by it granted broad powers, including that of loaning public money to co-operative associations (7 U. S. C. § 521 et seq. [see 12 USCA § 1141 et seq.]), evidently recognized Farmers National as a lawful and proper agency for carrying out the purposes of the act by advancing to it many millions of dollars of public funds wherewith it might carry on upon a scale so large that an aggregation of numerous individual co-operatives must have been in contemplation.

■ It is urged that the clearing corporation is an entity entirely separate from the Board of Trade, and that for denial of membership therein, for whatever reason, the Board of Trade is in no way responsible.

Membership in the Board of Trade without the privilege of clearing trades made thereon would fall far short of conferring the

full advantage of a contract market. The right to clear trades which are made on the board cannot be separated from the right to make trades on the board without seriously impairing marketing facilities. To lodge in a separate and independent corporation the function of clearing the trades made on the board would separate from the contract market a function quite indispensable.

The chronology of events strongly suggests that the board, with design to place this essential facility or privilege of a contract market beyond the control of the Secretary of Agriculture, abandoned the practice of itself clearing the trades by creating a separate corporation to take over this function.

But in view of all the facts it is plain that, while in form the clearing of trades was done through a separate independent corporation, in reality the clearing of the trades remained as completely as ever before within the absolute power and control of the board. Rule 310 of the board specifies that the trades of its members, made on their own behalf or on behalf of nonmembers, must be cleared through the clearing corporation. Membership in the clearing corporation, the personnel of its board of governors, its by-laws, rules, and regulations, remained and are at all times under the control of the Board of Trade. Rule 312 prohibits the clearing corporation from changing its by-laws without consent of the Board of Trade. Rule 311 provides that, upon a vote of twelve directors of the board, clearing through the clearing corporation may be discontinued and some other method of clearing instituted.

With such absolute and continuous domination and control of the clearing corporation in the Board of Trade, the board is not in position to maintain that through this mere corporate form it has placed the privilege of unhampered clearing of trades beyond its power to accord such privilege to co-operatives or their representatives, in accordance with the provisions of the Grain Futures Act.

We conclude that the Board of Trade, with its plenary power over clearing of trades made thereon, may be held responsible for any transgression of the Grain Futures Act through withholding from co-operatives or their qualified representatives any clearing privileges which members of the board and of the clearing corporation may enjoy.

But appellant maintains that upon the showing before the commission Farmers National did not appear to have "adequate financial responsibility" to entitle it to mem-bership in the clearing corporation, in compliance with section 5 (e) of the Grain Futures Act.

Before the commission there did not seem to be any serious controversy as to the submitted figures of Farmers National's financial statement. The consolidated balance sheet as of February 29, 1932, shows cash of $4,274,-345 and current assets of $21,992,744.98. It shows an obligation to the Federal Farm Board of $16,485,723.28 as a deferred liability for advances, for which the Farm Board held Farmers National's demand notes.

It is contended that if these notes were all suddenly called for payment Farmers National might not be able to meet them. But such matters must be considered in the light of usual and ordinary happenings and practices. Few financial institutions there are which would survive a sudden call for payment of all their outstanding obligations, notwithstanding in the ordinary course of affairs they would be unquestionably solvent. There was and is no likelihood of such a demand upon Farmers National, and its financial responsibility should not, for the purposes of this inquiry, be so tested.

The evidence shows it to have had a very substantial balance, such as would undoubtedly have been deemed sufficient in the case of any other individual or corporation otherwise acceptable for membership.

Besides, it appears that at the end of each day traders on the board are required to clear all their trades of that day, and the clearing corporation requires members to keep on deposit sufficient cash or securities as margins for the protection of trades cleared for the members. Such margins are usually quite uniform, but rule 596 specifies that in emergencies the rule may be departed from, and in the discretion of the board of governors the member must deposit further margins within an hour after they are demanded, and, failing so to deposit, the clearing corporation may close his trades at once. The rules also require daily settlements, and thus the liability of a member to the clearing corporation can never exceed that for a single day's business. For further security to the clearing corporation it retains each member's shares of stock therein.

With Farmers National's indicated financial condition, coupled with the carefully guarded limitation on liability to the clearing corporation of its members, we are satisfied that Farmers National's financial condition afforded no substantial ground for its exclu-

sion from membership in the clearing corporation, and the commission was well warranted in so holding.

■ Appellant raises the contention that paragraph (a) of section 6 of the Grain Futures Act, which authorizes suspension by the statutory commission of a contract market designation in case the designatee transgresses the act, is unconstitutional because such a proceeding "is essentially criminal" and is in derogation of section 2 of article 3 of the Constitution, which provides that trial of crimes shall be by jury.

The premise that this is in essence a criminal proceeding rests wholly in assertion; no authority is cited in support. We see nothing of criminal nature in a proceeding for the revocation of a license or permit or designation granted under the authority of a statute which also authorizes revocation in case the grantee transgresses the statute.

■ But unconstitutionality of the paragraph is further asserted under so much of the Fifth Amendment as prohibits deprival of property without due process of law. It is urged that the suspension of appellant's designation as a contract market will cause appellant great and irreparable property loss, and that this may not be done without trial in a court of law.

The Future Trading Act (42 Stat. 187), predecessor of the Grain Futures Act (7 US CA § 1 et seq.) was declared unconstitutional upon grounds not here involved. Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822. Thereupon Congress passed the Grain Futures Act, the constitutionality of which was assailed and upheld in Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839. The court there said (page 40): "The Board of Trade conducts a business which is affected with a public interest and is, therefore, subject to reasonable regulation in the public interest." But the court declined to consider, as not there involved, the alleged unconstitutionality of the penalty clause of the act.

But in sustaining the constitutionality of the act the general statutory scheme for effectuating its purposes must have been in contemplation. The statutory plan of contract markets and the designation of boards of trade as such is so intimately and essentially interwoven with the general plan as to leave little room for doubt that its constitutionality was impliedly sustained in the Olsen Case.

Granted the constitutional power to designate boards of trade as contract markets upon application by the boards, we perceive no reason why Congress might not properly lodge with some instrumentality the power to suspend or revoke such designation upon sufficient cause, first according reasonable opportunity for defending against any charge, as well as for judicial review of any suspending order. The statute provides for notice and hearing before the commission, and for appeal from its order to the Circuit Court of Appeals within specified time upon giving bond for costs, and that pending decision of the appeal the order of the commission shall not be effective.

Appellant made application under the law to be accorded the status of a contract market, and was accordingly designated as such, and for years next prior to the complaint herein operated under such designation, well knowing that by the terms of the act transgression of its provisions might entail its specified consequence.

A comparable situation was recently dealt with in a case involving suspension by a similarly constituted statutory commission of a stockyards corporation for violation of the Packers and Stockyards Act of 1921 (7 US CA § 181 et seq.). The same questions of constitutionality were raised, and for substantially the same reasons as are here urged. The opinion therein discusses the questions, and cites authorities thereon, and for brevity we refer to it without quoting therefrom. Farmers Livestock Commission Co. v. United States (D. C.) 54 F.(2d) 375.

■ Appellant urges that Farmers National has disqualified itself from having its sought for relief because for a period of twenty-two months ending December 1, 1931, it dealt in the products of nonmembers of co-operative associations in amount greater in value than handled by it for members of such associations, in transgression of paragraph "Third," section 1, of the Capper-Volstead Act (7 U. S. C. § 291 [7 USCA § 291, par. 3]). This section authorizes producers of agricultural products to associate themselves together and have marketing agencies in common for the marketing and handling of products of the producers, subject to several conditions, one of them being: "And in any case to the following: Third: That the association shall not deal in the products of non-members to an amount greater in value than such as are handled by it for members."

The act specifies no particular time or period of time for making the comparison, nor

does it directly define what is to be regarded as member or as nonmember business.

The Grain Futures Act, adopted September 21, 1922 (7 U. S. C. c. 1 [7 USCA § 1 et seq.]), specifies as one of the conditions for the designation of a board of trade as a "contract market" that "the governing board thereof does not exclude from membership in, and all privileges on, such board of trade, any duly authorized representative of any lawfully formed and conducted cooperative association of producers," etc. Section 7 (e). In this there is recognition of the policy manifested in the quoted clause from the Capper-Volstead Act; and a board of trade would not be required to admit to its privileges a co-operative which is not lawfully conducted, as would be the case if the co-operative were pursuing the practice of permitting its non-member dealings to exceed in value those of its members.

The Agricultural Marketing Act (June 15, 1929, 7 U. S. C. c. 22 [see 12 USCA § 1141 et seq.]), which authorized grain stabilization corporations, also recognized the same limitation upon co-operatives by providing that "cooperative association" means any association qualified under the Capper-Volstead Act. (Section 535, 7 U. S. C. [see 12 USCA § 1141j]).

As further indicating the policy of continued adherence to the limitation upon business which may be transacted by co-operatives, the recently adopted amendment to the Agricultural Marketing Act (June 16, 1933 § 50 et seq. [12 USCA § 1141c et seq.]) directly, and without reference, incorporates the very same limitation upon the nonmember business, of co-operatives. .

█ It appears from the record, and was found by the commission, that during the twenty-two month period Farmers National handled for its members 163,403,000 bushels of grain valued at $104,356,617; and for non-members 110,092,000 bushels valued at $59,-328,000. But the controversy as to this matter is in relation to the grain which Farmers National handled during the period for Grain Stabilization Corporation, to the amount of 137,787,000 bushels valued at $81,274,000. Appellant contends that this last is nonmember business, which, if added to the admitted nonmember business, makes the business in that classification exceed by about $35,000,000 in value the member business transacted during that period. The commission reasoned and found that this was neither member nor nonmember business, but was business handled for a governmental instrumentality created by law, and operating under the general supervision of the Farm Board to carry out a definite governmental policy, and therefore did not fall within either classification, and may not be included in making the computation.

If the dealings with Grain Stabilization are to be considered as nonmember business, Farmers National transgressed the statute authorizing co-operative associations; and, at least while persisting in such practices and in its right to continue them, would not be entitled to have those privileges it seeks.

The Capper-Volstead Act, which authorized co-operative associations, was to that extent in derogation of the anti-trust laws; and it was clearly the intent of Congress, in adopting the act, to guard against creation thereunder of combinations that might tend to monopoly beyond the extent authorized by the Capper-Volstead Act.

The Agricultural Marketing Act provides for the creation or recognition, by the Farm Board, of stabilization corporations whose entire outstanding stock or membership interests are owned only by co-operative associations handling the commodity. It provides, in subsection (b) of section 529, 7 U. S. C. (12 USCA § 1141g), that such a corporation may (1) act as a marketing agency for its stockholders or members in handling for their account any quantity of the commodity or its food products; and (2), for the purpose of controlling any surplus in the commodity in furtherance of the policy declared in section 521, 7 U. S. C. (12 USCA § 1141), may prepare, purchase, handle, store, process, and merchandise, other than for the account of its stockholders or members, any quantity of the agricultural commodity or its food products whether or not such commodity or products are acquired from its stockholders or members.

When Grain Stabilization Corporation, with its vast purchasing power, undertook to buy grains, it went about it just as any other buyers of such commodities. It bought in the open market, in the manner usual to such dealings. It would place its orders where it saw fit, and pay the commissions ordinarily incident to such transactions. If it undertook to favor Farmers National in the placing of orders and Farmers National thus received the usual commission thereon, this of itself did not make such dealings of Farmers National member transactions. Where any such dealings had no relation to the products of co-operative members, such dealings were non-

member business. The fact that all or a large part of the profits of such dealings between Farmers National and Stabilization Corporation would ultimately find their way to the co-operative members is beside the question; that fact would not as to Farmers National make member business of transactions which were otherwise clearly not such.

It was testified that the Grain Stabilization dealings with Farmers National included grains taken as delivery on futures contracts by Stabilization Corporation and wherein Farmers National acted as broker. It does not appear from the record whether all—or, if not all, what part—of these dealings were of this nature; nor whether, or to what extent, these dealings represented the products of co-operative members. Nor does it appear from the record to what extent, if any, the dealings represent purchases by Stabilization Corporation from Farmers National of commodities produced by co-operative members, and which would be classifiable as member business. If these, with the conceded member dealings, exceeded the nonmember dealings, the statute would not in this regard have been transgressed by Farmers National, and it would be entitled to the relief it asks.

Being of the view that the commission was not warranted in holding that the dealings with Grain Stabilization Corporation were neither member nor nonmember business, and that such transactions must be classed either as member or as nonmember dealings, it is all-important to the proper determination of this proposition to ascertain which of these dealings were member and which nonmember business. Since the record affords no fact basis for making such classification of this great volume of business transacted by Farmers National for Grain Stabilization Corporation, we believe that, before final pronouncement in a matter of such large concern to all involved, opportunity should be given for making such classification, and that for such purpose the cause should be remanded to the commission for the hearing of further evidence bearing thereon, and determination of the issue accordingly.

The court therefore directs that the order entered herein by the commission be set aside and that the cause be remanded to the commission for further proceedings as above indicated.

The court further directs that, if after such further proceedings the commission shall determine that the nonmember dealings of Farmers National exceeded in value the member dealings, and shall deny the relief herein sought by Farmers National, it shall be without prejudice to Farmers National again to present a petition to like effect in case it shall appear that theretofore Farmers National has in good faith, and in practice, definitely and permanently abandoned the transaction of business for nonmembers greater in value than its business transacted for members.