### WRIGHT v. SECURITIES AND EXCHANGE COMMISSION.
### No. 12.

Circuit Court of Appeals, Second Circuit.
May 20, 1940.

Isidor J. Kresel, Garey & Garey, Morris F. Goldstein, and Julius I. Puente, all of New York City (Isidor J. Kresel, Eugene L. Garey, Milton I. Hauser, Wm. Peyton Marin, and Morris F. Goldstein, all of New York City, of counsel), for petitioner.

Chester T. Lane, Gen. Counsel, Ganson Purcell, Hugh D. Wise, Jr., Francis Thornton Greene, and Bernard Meltzer, all of Washington, D. C., for respondent.

Before SWAN, AUGUSTUS N. HAND, and PATTERSON, Circuit Judges.

SWAN, Circuit Judge.

Pursuant to section 25(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78y(a), Charles C. Wright has filed his petition in this court to review and set aside an order of the Commission expelling him from membership in the New York Stock Exchange and other national securities exchanges of which he was a member. The order was entered in proceedings initiated under section 19(a) (3) of the Act, 15 U. S.C.A. § 78s(a) (3), which authorizes the Commission, if in its opinion such action is necessary or appropriate for the protection of investors, to suspend for a period not exceeding twelve months or to expel from a national securities exchange any member thereof whom the Commission finds to have violated any provision of the Act. On February 27, 1936, Wright was directed to show cause why he should not be suspended or expelled from various exchanges for alleged violation of sections 9(a) (1) and 9 (a) (2), 15 U.S.C.A. § 78i(a) (1) and § 78i (a) (2). By a supplemental and amended order additional persons, charged with acting in concert with Wright, were brought into the proceedings. Hearings were had before a trial examiner, commencing in May, 1936, and continuing intermittently until March, 1937, and a vast amount of evidence was taken. The printed record before this court comprises more than 3,500 pages. On February 28, 1938, the Commission published its findings and opinion and entered an order of expulsion against Wright and of suspension against his associates King and Stern. The two latter have not sought review of the order. Wright's petition was filed in this court April 26, 1938. It was not brought on for argument until February 15, 1940.

The petitioner's first point is that there is no substantial evidence to support the Commission's finding that Wright violated sec-

SWAN, Circuit Judge, dissenting in part.

tion 9(a) (2), 15 U.S.C.A. § 78i(a) (2).[1] The market operations upon which this finding was based began on September 11, 1935, and related to common stock of Kinner Airplane & Motor Corporation, Ltd. This stock was registered pursuant to section 12 of the Act, 15 U.S.C.A. § 78l, and was listed and traded in on the Los Angeles Stock Exchange and the San Francisco Curb Exchange. A few days prior to September 11th, Stern and King had obtained from Robert Porter an option on 160,000 shares of Kinner stock to be taken in blocks of 20,000 shares at prices increasing from 45 to 60 cents per share. Upon Stern's insistence the option ran to King's father, although the latter had no financial interest in it. That a manipulation of the market to boost prices was contemplated by the parties to the option is inferable from its terms and is shown unmistakably by telegrams exchanged between Stern and Porter. Stern had offered Wright an interest in the option but the testimony is that he had declined it. Nevertheless within an hour after Wright began to buy the stock on September 11th, Stern telegraphed to Porter "Have started". During that day Wright purchased 18,500 shares at prices increasing from 46 to 60 cents and sold 9,000 shares at prices ranging from 55 to 60 cents. Wright placed his orders through accounts standing in the names of others. Of the shares purchased 11,500 were allocated to an account which Wright opened in the name of an impecunious friend, Alvin Richmond, who had no knowledge of the account until long afterwards; 2,500 shares were allocated to an account of Wright's wife, and a like number to an account of his secretary. With respect to these accounts Wright held powers of attorney, but in purchasing the Kinner stock he acted without the knowledge of either Mrs. Wright or Miss Mackaill. The remaining 2,000 shares of purchased stock were bought for E. R. Whitehead, a stockbroker, at his request. In some of the transactions Wright knowingly bid more than the current market price. Such "reaching" for the stock tends to substantiate the Commission's contention that he sought to raise the price because of the outstanding option. The 9,000 shares sold on September 11th were allocated to the Richmond account. On the following day 2,500 shares more were sold at 62½ cents, thus closing out the Richmond account with a profit of $640.25. There is testimony that Richmond was paid this profit, but the Commission did not believe it. From September 12 to 16, inclusive, Wright sold 41,300 additional shares at prices ranging from 62½ to 75 cents through an account in the name of Stewart Haddock, another impecunious friend. Forty thousand of these shares were obtained under the Porter option at a price of 45 cents. Thus, between September 11 and 16 the market price of Kinner stock had been boosted from 45 to 75 cents. Wright's purchases represented 79 per cent. of all purchases on the Los Angeles Exchange during the active buying or "mark-up" phase of his operations, and his sales were about 40 per cent. of all sales during the six days. Prior to his entry the market had been thin, the average daily volume of trading for the preceding three months being only about 730 shares.

It is plain that Wright effected a series of transactions in Kinner stock "creating actual or apparent active trading in such security" and "raising the price" thereof. The Commission found that he did so for the purpose of inducing the purchase of Kinner stock by others, that is, of unloading the optioned stock through the Haddock account. Wright had introduced Haddock to Stern and there is testimony that Haddock acquired from Stern and King an interest in the Porter option to the extent of the first 40,000 shares to be taken down. The Commission did not credit this testimony; it made a finding that Haddock was merely a person whose name Wright used. There are numerous circumstances tending to support this conclusion. Wright gave all the orders for the Haddock account. After a sale of 5,000 shares for the

---

[1] "§ 78i. Manipulation of security prices

"(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

\* \* \* \* \* \*

"(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

Richmond account he ordered it split between Richmond and Haddock. He endorsed checks made out to Haddock by the brokers, delivering one to Stern, apparently as a finder's fee, and cashing the other, as he says, for Haddock. Although Haddock was impecunious, more than $5,000 of the profit realized in the account in his name was allowed to remain there for several months and was not checked out to him until Wright had learned that the Commission was investigating the transactions in Kinner stock. It is true that in his 1935 income tax return Haddock reported as his own the profit made on Kinner sales in his account, but this fact loses much of its significance in the light of Wright's prior knowledge of the investigation. The foregoing are but some of the circumstances from which inferences were drawn adverse to Wright's innocence. Others are recited in detail in the Commission's findings and opinion. It would serve no useful purpose to repeat them here. Suffice it to say that we think there was substantial evidence to support the facts upon which the Commission predicated its finding that Wright manipulated the market in violation of section 9(a) (2) of the Act. If so supported, the findings of fact are conclusive upon this court. Sec. 25(a), 15 U.S.C.A. § 78y(a).

■■ The petitioner also contends that there was no substantial evidence to support the finding that he violated section 9 (a) (1), 15 U.S.C.A. § 78i(a) (1).[2] This forbids "matching" orders for the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false and misleading appearance with respect to the market for any such security. The Commission found that Wright had violated the statute in two instances. About 1:30 p. m. on September 11, 1935 he placed an order to sell 10,000 shares at 60 for the Richmond account and about an hour and a half later, he ordered for the Mackaill account the purchase of 2,500 shares at the market, which was then apparently 57½. He was notified by his Los Angeles broker that his buy order would probably be filled in part by his sell order, but replied that the purchase and sale were for different accounts. The buy order was executed by the purchase of 100 shares at 57½ and 2,400 shares at 60, of which 800 were shares that were being offered through the Richmond account. The second instance was similar. About 4 p. m. Wright placed through a different broker an order to buy 2,500 shares at the market for the account of Mrs. Wright. This met and partially crossed (to the extent of 2,200 shares) the unfilled portion of his prior order to sell 10,000 shares at 60. At least literally, what Wright did was not within the terms of the statute; the buy orders were not "of substantially the same size" as the sell order, even if it be assumed that the requirements as to similarity of time and price were satisfied. To make them matched orders the Commission is forced to argue that an order to sell 10,000 shares is by practice of the exchange an order to sell 100 shares and as many additional 100 share lots as possible, up to the total of 10,000 shares, and similarly an order to buy 2,500 shares is an order to buy one or more (up to 25) lots of 100 shares each. Under the rules of the Los Angeles Exchange if an order is not to be executed in board lots, it must be designated "all or none." Despite this practice, with which Wright as an experienced trader may be assumed to have been familiar, we cannot accept the Commission's argument; it disregards the statutory requirement that the matched orders be "of substantially the same size." The statute must be strictly construed since

---

[2] "§ 78i. Manipulation of security prices

"(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

"(1) For the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security, * * * (B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties."

a violation of it may be punished as a crime. Section 32, 15 U.S.C.A. § 78ff. We conclude that the finding that Wright violated section 9(a) (1) of the Act is not supported by the evidence.

■ The petitioner raises numerous constitutional objections to the order of expulsion. First, he argues that the act runs counter to the Fifth Amendment in vesting in the Commission the functions of prosecutor, judge and jury and empowering it to fix a "punishment" which deprives the petitioner of the right to conduct a lawful business in a lawful manner. Basically this is an attack upon the accepted procedure of numerous administrative agencies in which the functions of enforcement and adjudication are blended. That such blending is not sufficient to invalidate a hearing fairly conducted is firmly established. It will suffice to cite National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46, 47, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L. R. 1352, and Morgan v. United States, 304 U.S. 1, 14, 15, 58 S.Ct. 773, 999, 82 L.Ed. 1129.

■ In considering the order of expulsion as a punishment for past offenses the petitioner is in error. Section 19(a) (3), 15 U.S.C.A. § 78s(a) (3), authorizes an order of expulsion not as a penalty but as a means of protecting investors, if in the Commission's opinion such action is necessary or appropriate to that end. Since the purpose of the order is remedial, not penal, there is no basis for the contention that Wright's violation of the statute must be proved beyond a reasonable doubt. See Board of Trade v. Wallace, 7 Cir., 67 F.2d 402, 407, certiorari denied 291 U.S. 680, 54 S.Ct. 529, 78 L.Ed. 1067. Nor can we accept the alternative argument that at least a fair preponderance of evidence is required. The statute declares in section 25, 15 U.S.C.A. § 78y, that the Commission's findings of fact shall be conclusive if supported by substantial evidence. In imposing this limitation upon judicial review, we see no violation of constitutional limitations.

■ It is urged that removal of the hearing to Los Angeles and thereafter to San Francisco was contrary to due process of law. As to the Los Angeles hearing Wright had notice, and it was certainly discretionary with the Commission to order hearings to be conducted where numerous witnesses and original records of the market transactions were located. As to the trial examiner's transfer of hearings from Los Angeles to San Francisco without notice to Wright, he has a valid grievance. It could not be condoned if the evidence taken at San Francisco were essential to sustain the order; but it is not. The Commission's opinion refers to all the California evidence as merely cumulative and not indispensable to its decision. If the San Francisco evidence be entirely disregarded, there is still substantial evidence to support the Commission's findings as to manipulation of the market contrary to section 9(a) (2). Hence we cannot regard the error in taking testimony at San Francisco as fatal. See Mammoth Min. Co. v. Salt Lake Foundry & Machine Co., 151 U.S. 447, 451, 14 S.Ct. 384, 38 L.Ed. 229.

■ The petitioner further argues that section 9(a) (2) of the Act is unconstitutional because it is vague, indefinite and uncertain, fixes no ascertainable standard of guilt, and does not inform a person charged with violation thereof of the nature and cause of the accusation against him. The contention is not sustainable. Section 9(a) (2) sufficiently defines the conduct it declares unlawful. See Securities & Exchange Comm. v. Torr, D.C.S.D.N.Y., 15 F. Supp. 315, 318, reversed on other grounds in, 2 Cir., 87 F.2d 446. See, also, Omaechevarria v. Idaho, 246 U.S. 343, 348, 38 S. Ct. 323, 62 L.Ed. 763; Sproles v. Binford, 286 U.S. 374, 393, 52 S.Ct. 581, 76 L.Ed. 1167; Bartlett Frazier Co. v. Hyde, 7 Cir., 65 F.2d 350, 354; certiorari denied, 290 U. S. 654, 54 S.Ct. 70, 78 L.Ed. 567.

■ The Torr case, with the authorities therein cited, also disposes of the contention that in enacting the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., Congress attempted to enter a field reserved to the states, namely, the regulation of intrastate commerce.

■ It is urged that section 19(a) (3) is an unlawful delegation of legislative power to an administrative agency because the statute declares no standards to guide the Commission in determining whether suspension or expulsion is necessary or appropriate for the protection of investors. We cannot accept the argument. Congress has defined the conduct that is unlawful and has left to the administrative agency, subject to judicial review, discretion to determine whether protection of investors requires that one who has been found guilty

of unlawful conduct on a national securities exchange should be temporarily or permanently excluded from carrying on activities as a member of such an exchange. The "protection of investors" is a sufficiently definite criterion to guide the Commission. See New York Central Securities Corp. v. United States, 287 U.S. 12, 24, 53 S.Ct. 45, 77 L.Ed. 138. Numerous cases are persuasive that the delegation to an administrative agency of discretion as to revocation of a license is not unconstitutional. See Board of Trade v. Wallace, 7 Cir., 67 F.2d 402, 407; Brinkley v. Hassig, 10 Cir., 83 F.2d 351, 354; Hall v. Geiger-Jones Co., 242 U.S. 539, 553, 37 S.Ct. 217, 61 L.Ed. 480, L.R.A.1917F, 514, Ann.Cas.1917C, 643; Northwest Bancorporation v. Benson, D.C. Minn., 6 F.Supp. 704, affirmed 292 U.S. 606, 54 S.Ct. 775, 78 L.Ed. 1468. We think the principle of these cases is equally applicable, even though the Commission is unauthorized to admit to membership in a national securities exchange.

The petitioner also contends that the Commission had no jurisdiction to make its order of expulsion because section 27 of the Act, 15 U.S.C.A. § 78aa, declares that the district courts of the United States "shall have exclusive jurisdiction of violations of this chapter".[3] What is meant by section 27 is that all criminal or civil proceedings initiated in the courts for violations of the act must be brought in the courts designated by the section. In that sense those courts have "exclusive jurisdiction." Under the most elementary principles of statutory construction section 27 must be so interpreted, if possible, as to be consistent with other provisions of the statute. It certainly was not intended to repeal section 25(a), 15 U.S.C.A. § 78y(a), which declares that any person aggrieved by an order issued by the Commission in a proceeding under this title to which such person is a party may obtain a review of such order in a circuit court of appeals, whose jurisdiction is also declared to be exclusive. Nor can it be supposed to have been intended to deprive the Commission of the jurisdiction conferred upon it by section 19(a) (3) to entertain a proceeding of the character therein expressly authorized. Construing section 27 as we have suggested gives effect to all the sections.

Finally, it is urged that the record does not justify the imposition of the order of expulsion since the Commission's finding that expulsion is necessary and appropriate for the protection of investors is unsupported by any proof. We think that proof of market manipulation resulting in higher prices at which the optioned stock was sold to the investing public is enough to justify the Commission's opinion that action by it was "necessary or appropriate for the protection of investors." The petitioner urges that the order of expulsion is unduly harsh; that an order of suspension would have accorded investors all the protection they need. So far as appears this was Wright's first infraction of the statute. For many years he has been operating in Wall Street and his transactions in Kinner stock are the only blemish upon his reputation. There is nothing to indicate that he is an habitual manipulator or would be likely to try to manipulate the market in the future. To deprive him for all time of an opportunity to pursue his calling in a lawful manner does seem severe. But a majority of the court hold the view that we are without power to supervise the Commission's discretionary determination that expulsion of the petitioner is necessary and appropriate for the protection of investors. The writer of this opinion does not share that view, believing that under the power conferred upon this court to "modify", as well as to affirm or to set aside an order in

[3] "§ 78aa. Jurisdiction of offenses and suits

"The district courts of the United States, the district court of the United States for the District of Columbia, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. * * *"

whole or in part, we may reduce the relief accorded investors. My own opinion is that the Commission should be directed to reduce it.

 In view of the fact that the court has found insufficient evidence to support the finding that Wright matched orders contrary to section 9(a) (1), the order is reversed and the cause remanded in order that the Commission may determine, in its discretion, whether or not to modify its order to one of suspension rather than expulsion.