**Charles SELIGSON, as Trustee in Bankruptcy of Ira Haupt & Co., a Limited Partnership, Bankrupt, Plaintiff,**

v.

**NEW YORK PRODUCE EXCHANGE et al., Defendants.**

**No. 66 Civ. 1016.**

United States District Court,
S. D. New York.

May 17, 1974.

Weil, Gotshal & Manges, New York City, for plaintiff.

Baer & Marks, New York City, for defendants New York Produce Exchange Clearing Assn., Solomon J. Weinstein, David L. Boyer.

Holtzmann, Wise & Shepard, New York City, for defendants, New York Produce Exchange, Donald V. Mac-Donald, Sidney Fashena, I. Usiskin & Co., Carl R. Berg.

Emmet, Marvin & Martin, New York City, for defendant Fahnestock & Co.

Schwarzberg & Kittrell, New York City, for defendant Harry B. Anderson.

Brown, Wood, Fuller, Caldwell & Ivey, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendants Bunge Corp. and Walter C. Klein.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Continental Grain Co. and Harold H. Vogel.

## OPINION

ROBERT L. CARTER, District Judge.

### Explanatory Statement

This case arises out of what has come to be known as the "Salad Oil Swindle", one of the most notorious commercial and financial disasters in American history. The swindle resulted in losses to various exporters, brokers, warehousemen, financial institutions, and insurers in excess of $100 million, and led to a string of lawsuits and investigations extending over the past ten years. The roster of persons and institutions adversely affected by master swindler Anthony DeAngelis, working through controlled corporations like Allied Crude Vegetable Oil Refining Corporation (Allied),[1] is long and impressive, and includes not only the parties to this litigation, but also such august institutions as the American Express Company and the Chase Manhattan Bank.

To capture the swindle in all its glory would take a book. Fortunately, it has already been written. *See* N. Miller, *The Great Salad Oil Swindle*, (1965). The instant action, however, as framed by defendants' motions for summary judgment, involves a rather discrete series of events, revolving around the activities of Allied's principal commodities broker, Ira Haupt & Co. (Haupt) in cottonseed oil futures trading on the New York Produce Exchange (the "Exchange"). Accordingly, a few words about the Exchange and how it functions are in order.

### The Cottonseed Oil Futures Market

The New York Produce Exchange is a formal, self-regulated, contract market, similar in concept to a securities exchange, and on it contracts[2] for the purchase and sale of commodities to be delivered on specified dates in the future, "futures" for short, are traded.[3] The principal terms of these futures, other than price, are prescribed by the Exchange.[4]

Futures trading should be distinguished from ordinary commercial, or "cash" trading. In a cash transaction, whether for present or future delivery, the purchase price usually is paid in its

---

1. "Allied" is used herein to denominate not only Allied Crude Vegetable Oil Refining Corp., but also DeAngelis and the other entities through which he dealt in vegetable oils.

2. Each cottonseed oil contract covers 60,000 pounds of oil.

3. Just as securities exchanges are established pursuant to, and are subject to, the Securities Exchange Act of 1934, the Produce Exchange is a creature of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 1 et seq.

4. Although several commodities futures were traded on the Exchange during the period relevant to this lawsuit (the first eleven months of 1963), it is cottonseed oil futures trading with which this action is principally concerned, and references, *infra*, to futures or to futures trading are references to cottonseed oil futures unless the specific context clearly indicates otherwise.

entirety when the transaction is effected, and the oil bargained for is consumed, exported, or otherwise disposed of by the purchaser. Futures, on the other hand, are purchased through a clearing house, here the New York Produce Exchange Clearing Association ("Clearing Association" or "Association") by putting up a fixed percentage of the purchase price as "original margin," and by putting up such additional "variation margin" during the day as the Manager deems necessary "to protect the Association against fluctuations in the market, pending the daily settlement."

Futures normally are not used to effect delivery—most are liquidated prior to the delivery date—but instead are used by farmers, processors, exporters, and others who deal in a commodity as a means of "hedging" their commodity positions and "cash" commodity obligations against unanticipated fluctuations in price. A trader who, as a result of normal business dealings, has accumulated or is obligated to buy a large quantity of cash cottonseed oil (and is therefore, "long" in cash oil), can hedge his bets by taking a futures position opposite to his cash position, i. e., he can go "short" and become the seller in an equivalent volume of futures contracts. Thereafter, if the price of oil declines, although the value of the trader's accumulated oil likewise declines, his loss is offset by the fact that he has entered into futures contracts to sell oil at pre-decline price levels. Futures may also be traded for purely speculative purposes so long as special original margin requirements are met.

A futures contract is "cleared" through the Clearing Association when the Association "accepts" the contract, thereby assuming the obligations and succeeding to the rights and benefits under the contract of both parties to it. In turn, the clearing members who

present a futures contract for clearance engage that they will, in response to a daily report prepared by the Association, deliver to the Association a check made to its order or a draft made to the member's order and drawn on the Association, and that the check or draft will include the amount (fixed in the report) necessary to "mark contracts to the settlement price." Thus, each business day each clearing member pays to or receives from the Association a sum equal to the difference between the value of its futures at the last posted settlement price, and their value at the next previous settlement price.

*Background Facts*

During the latter part of 1963, Haupt and other brokers acquired on behalf of Allied a very substantial long position in cottonseed oil futures. By November 14, 1963, Allied was the buyer in approximately 90% of the futures contracts traded on the Exchange. On that day Berg, the Managing Director of the Exchange, received from the Commodity Exchange Authority (CEA)[5] a statement of the positions of persons or companies with futures positions in excess of 100 contracts. Berg thereupon indicated the magnitude of Allied's holdings to defendants Anderson and MacDonald, and MacDonald in his capacity as President of the Exchange immediately called a meeting of the Board of Managers for that afternoon. At that meeting a Control Committee was appointed, and directed and empowered to determine the precise nature and dimensions of Allied's position.

A concentration in the long interest like that achieved by Allied is fraught with potential danger to the market, inasmuch as it reduces liquidity, lessens price stability, heightens the risk of a disorderly liquidation of contracts should the demand curve faced by the party holding the interest shift, and in

5. The CEA is the agency within the United States Department of Agriculture through which the Secretary of Agriculture exercises

the oversight duties placed upon him by the Act.

general threatens the maintenance of an orderly market. At the same time, a concentrated long position leaves the person who accumulates it exceedingly vulnerable to declines in the market. And decline the market did, sharply between November 14 and November 19, 1963. During that period Haupt was called upon by the Clearing Association to put up variation margin, and in turn Haupt called upon Allied for reimbursement. By November 19, Allied was unable to respond to Haupt's margin calls, and filed a petition under Chapter XI of the Bankruptcy Act.

Later that day, at a joint meeting of the Exchange's Executive Committee and the Association's Board of Directors, Allied's plight was revealed. Also disclosed was the fact that of the 10,273 futures contracts in which Allied was the buyer, 8,043 were held for it by Haupt. Those present were advised by representatives of Haupt that it would be unable to meet its margin requirements should the market continue to drop. After considerable discussion, and telephonic or personal consultation with approximately two-thirds of the Exchange's Board of Managers, the Executive Committee decided unanimously to recommend to the Exchange Board that trading in cottonseed oil futures be suspended until further notice, and that settlement prices be fixed. On November 20, the Exchange did not reopen, and the Board of Managers formally ratified the decision reached the previous day.

On or about November 22, 1963, Haupt discovered that warehouse receipts, which it received from Allied as collateral for the variation margin it put up during the November 14–19 market decline, were worthless. The receipts were forged, and the salad oil, the presence of which the receipts purported to authenticate, was non-existent. On March 23, 1964, an involuntary petition in bankruptcy was filed against Haupt.

## Plaintiff's Claims

Plaintiff is the trustee in bankruptcy of Ira Haupt & Co. Defendants include the Exchange; the Association; individuals who were employed by or served on the Board of Managers of the Exchange; the President and the Manager of the Association; and certain firms with which the individual defendants were associated in November, 1963.[6] All of the defendants are named in Counts One and Two of the Amended Complaint. Count Three names only the Association and the Exchange.

Count One of the Amended Complaint alleges that defendants are charged by the Act with maintaining an orderly market; preventing undue and undesirable speculative activity; preventing the manipulation of prices and cornering of the market; and operating the Exchange and the Clearing Association in a just, equitable, fair and honest manner. In derogation of these duties, defendants during 1963 and until November 14th failed to act even though they knew or should have known the nature

6. Defendant MacDonald was President and a Board member of the Exchange, and Chairman of its Executive Committee, and was employed by defendant Fahnestock & Co. (Fahnestock) as manager of its commodity department. Defendant Anderson was a member of the Exchange Board, and several of its committees including Executive, and was Vice-President of defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) in charge of its Commodities Division. Defendant Klein was a member of the Exchange Board and its Executive Committee, and was President of defendant Bunge Corporation (Bunge). Defendant Vogel was a Vice-President of the Exchange, a member of its Board and its Executive Committee, and was Executive Vice-President of defendant Continental Grain Company (Continental). Defendant Fashena was the Exchange's Treasurer, a member of its Board and Executive Committee, and was a general partner of defendant I. Usiskin & Co. (Usiskin). Defendant Boyer was the Manager of the Clearing Association, and defendant Weinstein was its President.

Defendant Berg was the Managing Director of the Exchange. His separately filed motion to dismiss this action pursuant to Rule 25(a) of the Federal Rules of Civil Procedure was granted on May 17, 1974, simultaneously with the filing of this opinion.

and extent of Allied's position in cotton-seed oil futures; that Allied's accumulation artificially affected prices and threatened maintenance of an orderly market; that they were required in the proper exercise of their regulatory duties to eliminate the threat posed by extreme market concentration, or at the very least were required to investigate in order to establish that no real threat existed.

Plaintiff further alleges that between November 14, 1963 and November 20, 1963, defendants knew that immediate action was needed in order to preserve an orderly market, and that trading should be suspended. However, the market was kept open solely so that prices could decline to the benefit of the "short interests" and to the detriment of the "long interests", principally Allied. This decision constituted bad faith regulation, and resulted in a loss to Haupt of $12,000,000, which amount of variation margin it paid to the Association during that period.

On November 20th, contends the plaintiff, it became apparent to defendants that should the market continue to decline, clearing members other than Haupt would have to assume the financial burden of additional margin calls, and of the liquidation of Allied's position in the open market. Therefore, trading was suspended on the 20th in bad faith in order to protect defendants' interests.

The circumstances that gave rise to Count One also underlie Count Two, which alleges that beginning on or about the Summer of 1963 and continuing until at least November 20, 1963, defendants engaged in a combination and conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by combining, conspiring, and agreeing among themselves to, *inter alia*, abdicate their statutory duties and obligations, control and fix prices of futures contracts from and after November 14, 1963, and permit some among them to profit from their loss. The gravamen of Count Two is that defendants' alleged improper motivation and bad faith in the exercise of their regulatory responsibilities renders their acts and omissions an unreasonable restraint of trade.

Count Three alleges that the Association and the Exchange are fraudulent transferees under New York State law, because the $12 million paid by Haupt to the association in variation margin between November 14, 1963 and November 20, 1963 was transferred without fair consideration at a time when Haupt was insolvent.

Defendants now move for summary judgment on all three counts.

## COUNT ONE

*Existence of a Cause of Action*

Defendants question whether the Act supports a cause of action by a member of an Exchange (or its trustee in bankruptcy) against the Exchange and its officers based on an alleged failure to regulate that member's own wrongful conduct. There are two aspects to defendant's challenge: whether an Exchange member-broker (as contrasted with a member-trader or the customer of a member) is entitled to bring suit; whether Haupt's own misconduct disentitles it from bringing the action.

In Deaktor v. L. D. Schreiber & Co., 479 F.2d 529 (7th Cir.) rev'd on other grounds, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973), two actions were consolidated, one brought on behalf of a class of short traders against the Chicago Mercantile Exchange (C.M.E.) and various members of the C.M.E., the other brought by twenty-four traders against the C.M.E., and against certain of its officers and members. The class plaintiff alleged that C.M.E. members manipulated and cornered the July, 1970 frozen pork bellies futures market, and that the C.M.E. failed to be aware of and halt promptly this unlawful activity. The individual plaintiffs charged the defendants with monopolization of trading in March, 1970 fresh eggs futures.

"There remains the question whether private damage actions are allowable under the Commodity Exchange Act. As noted earlier, no express provision is contained in the Act. The courts which have considered the question, however, have apparently uniformly concluded that such an action exists. [citations omitted]

. . . . . .

"It is a felony under 7 U.S.C. § 13(b) of the Act to manipulate or attempt to manipulate the price of any commodity or to corner or attempt to corner any such commodity. We think the enactment is at least in part intended to protect the interests of the plaintiff-traders in these actions. We therefore hold that a private cause of action exists under the Commodity Exchange Act in favor of the plaintiffs in these actions . . . ." *Id,* at 534.

■ Defendants suggest that this cause of action should not be available to Exchange member-brokers. However, brokers as well as customers suffer when an orderly market is not maintained. Notwithstanding the fact that Haupt's bankruptcy might have been caused by extra-market forces (viz. the fact that Haupt accepted forged warehouse receipts from Allied as security), the losses which Haupt seeks to recover here are directly related to the sharp plunge taken by the cottonseed oil futures market in November, 1963. Assuming, *arguendo,* that this market behavior was the result of defendants' malfeasance or nonfeasance, plaintiff has as great a right to be protected by maintaining this action as would a customer who held a long position on November 14th.

■ This conclusion is reinforced by the fact that private lawsuits, in addition to redressing injuries suffered by particular plaintiffs, play a role in fulfilling the Congressional purpose of insuring the maintenance of orderly markets. *Cf.* Pearlstein v. Scudder & German, 429 F.2d 1136, 1141 (2d Cir. 1970).

Moreover, the House Report accompanying the Act indicates that Congress was conscious that the Act's imposition of duties and responsibilities operates to protect the interests of exchanges themselves, hence of their members:

"The fundamental purpose of the measure is to insure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over those forms of speculative activity which too often demoralize the markets to the injury of producers and consumers *and the exchanges themselves.*" H.R.Rep.No. 421, p. 1, 74th Cong., 1st Sess. (1935) (emphasis added).

Neither the Exchange nor its employees and board members deny that they are required both by the Act and by Exchange By-laws to preserve an orderly market and prevent manipulation and cornering. However, defendants Bunge and Klein contend that an "abuse of discretion" standard should be applied to good faith actions taken by the Exchange in enforcing its rules. This contention has little relevance to so much of plaintiff's claim as alleges bad faith regulation. However, it does strike at that part of the complaint which alleges negligent failure to discover, investigate or act.

■ The duties imposed by § 7(d) of the Act and the corresponding portions of §§ 67 and 68 of the Exchange By laws are broadly scriped. When viewed in the context of a market the behavior of which is a function of the interrelation of many factors, not all of them precisely or instantaneously knowable or measurable, these provisions suggest that a significant amount of discretion is reposed in the Exchange in respect of the manner in which its statutory duties are to be complied with in any given set of circumstances. Thus, although a cause of action exists for negligent failure to regulate, *see* Baird v. Franklin, 141 F.2d 238 (2d Cir.) cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944); Pettit v.

American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y.1963), defendants' caution is well taken. However, defendants' refinement of *Baird* and *Pettit* does not, on the record before me alter whether there exist genuine issues of material fact in respect of defendants' alleged nonfeasance.

■ Defendants' contention that plaintiff cannot recover here because of Haupt's own misconduct has two basic thrusts: the defendants' alleged failure to fulfill their statutory obligations was not a "proximate cause" of Haupt's losses; defendants are entitled to assert the defense of *in pari delicto*. Obviously liability will not ensue unless a tortious act is a substantial factor, as well as an actual factor, in bringing about resultant harm. *See* Restatement, Second, Torts §§ 430–433. Defendants insist that any act they may have committed or omitted was robbed of this characteristic by an intervening or supervening cause; namely, the fact that the warehouse receipts which Haupt accepted from Allied proved to be worthless.

This argument assumes that defendants are entitled to benefit from an obligation (by Allied to reimburse Haupt) that ran only to Haupt, and not to any of the defendants. Moreover, the argument assumes that the losses Haupt seeks to recover stemmed from Haupt's insolvency. On the contrary, the complaint indicates clearly that the losses here claimed, $12,000,000, resulted from variation margin in that amount which Haupt paid to the Association between November 14 and November 19, 1963. Presumably, even had Haupt remained solvent following the salad oil swindle, it could have brought the instant action.

Even if Haupt's insolvency were inextricably bound up in the losses here claimed, and even if Haupt's acceptance of worthless warehouse receipts is viewed as an event which occurred at the time their worthlessness was discovered rather than contemporaneously with their delivery, acceptance of the receipts would not break a chain of causa-

tion unless it "is so unexpected that the injury is not to be a reasonably foreseeable result of the first act." Ingham v. Eastern Air Lines, Inc., 373 F.2d 227, fn 11 (2d Cir.) cert. denied sub nom. United States v. Ingham, 389 U.S. 931, 88 S. Ct. 295, 19 L.Ed.2d 292 (1967). There are sufficient admissions by defendants in the record from which one might reasonably infer that in November, 1963, defendants knew enough about DeAngelis' past business dealings to be suspicious of warehouse receipts tendered by him. Thus, there exists at least a genuine issue of material fact in respect of whether the worthlessness of the receipts was foreseeable to defendants.

■ Certain of the defendants urge that if they violated their regulatory duties under the Act, Haupt, as a member of the Exchange and subject to the Act, was, at a minimum, *in pari delicto*. And since this defense could have been raised against the bankrupt, it can be raised against the trustee who stands in its shoes. Relying on Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir.) cert. denied, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969), plaintiff contends that he is not subject to defenses to Count One which defendants could have asserted against Haupt. Here, however, in Counts One and Two, the trustee appears to be proceeding under §§ 70(a)(5) and 70(a)(6) of the Bankruptcy Act, rather than the "strong arm" provision utilized in *Buttrey*, § 70(e), and is therefore subject to the same defenses as would the bankrupt. 4A Collier on Bankruptcy § 70.28, p. 385 (14th Ed. 1971).

■ The doctrine of *in pari delicto* is not applicable to this case, given circumstances as they presently appear. In Nathanson v. Weis, Voisin, Cannon, Inc., 325 F.Supp. 50 (S.D.N.Y.1971), Judge Weinfeld outlined the considerations which caused him to reject the defense of *in pari delicto*:

"The basic question, as this court views it, centers not about the claims

asserted by plaintiffs against the defendant or the defense advanced in resistance to those claims, but rather about third parties not involved in the litigation—the investing public and *what policy with respect to the allowance or disallowance of the defense would best serve to carry out the prime purpose of the securities laws to protect the investing public.* (At pp. 52–53, emphasis added).

And in Pearlstein v. Scudder & German, *supra*, the court stated that:

"In our view the danger of permitting a windfall to an unscrupulous investor is outweighted by the *salutary policing effect* which the threat of private suits for compensatory damages can have upon brokers and dealers above and beyond the threats of governmental action by the Securities and Exchange Commission." (At p. 1141, emphasis added).

In Pettit v. American Stock Exchange, *supra*, the trustee-in-reorganization of a company was permitted to bring suit against the American Stock Exchange for its failure to stop the fraudulent activities of Exchange specialists, notwithstanding the fact that the company's president and controlling person conspired with the specialists.

"The Exchange argues, as it did in the case of the first count, that the statute is designed solely to protect investors and therefore cannot be utilized to vindicate rights of the corporation that stem primarily from mismanagement of insiders. As in the case of Section 10(b), however, the statutory scheme should not be so restricted where, as here, the loss to the corporation arises from a fraudulent transaction in its securities which is successfully perpetrated through the conduct of the Exchange." (at p. 29).

■■ The regulatory scheme established by the Commodity Exchange Act likewise is designed to protect investors and to police those who work in the marketplace. Taking into account the policy which best serves the prime purpose of the Act, viz. insuring "fair practice and honest dealing on the commodity exchanges and . . . provid[ing] a measure of control over those forms of speculative activity which too often demoralize the markets to the injury of producers and consumers and the exchanges themselves," the doctrine of *in pari delicto* must give way, at least insofar as defendants are charged with intentional failure to maintain the market. A different rule may be appropriate where plaintiff has acted wantonly and wilfully, and where defendant merely has been negligent, *Cf.* Tartell v. Chelsea Nat'l Bank, 351 F.Supp. 1071, 1079 (S.D.N.Y.) aff'd, 470 F.2d 994 (2d Cir. 1972), because in such circumstances the policing effect of permitting private actions to proceed may be substantially diminished. However, we need not reach this question until appropriate factual determinations are made at trial.

## Liability of the Clearing Association

■ The Clearing Association urges, as a threshold matter of law, that it cannot be liable under the first cause of action because it has neither a statutory nor a self-imposed duty to maintain an orderly market. It is neither a "contract market" (exchange), member of a "contract market", "commission merchant", nor "broker," and therefore is not required to register under the Act. 7 U.S.C. §§ 2 and 12a. Neither it nor its directors exercise any control over trading; rather, its function is simply to "clear" contracts.

■ Plaintiff, however, points to the prominent role *in fact* played by the Association in restricting the activity of its customers and in regulating the market, and submits as an example a letter dated April 25, 1963, from Perry E. Moore, a member of the Association's board of directors, to Weinstein, President of the Association. Moore's letter refers to a discussion during an April 22, 1963, Association board meeting concerning future margining of a firm de-

nominated "N", which firm was engaged in large offsetting "ex-pit" transactions (trades consummated other than by open outcry on the "floor" of the Exchange). Moore suggested applying a system of "scale-up" margins to "N".

On August 13, 1963, at an Association board meeting Weinstein expressed "mounting concern over the increasing concentration [of futures contracts] in the hands of a few firms." This concentration was being effected by "apparently affiliated interests" by means of "ex-pit" transactions. The Board authorized Weinstein to advise the Exchange of the Association's concern, to suggest *that the Exchange* adopt a scale-up system of margining, and to *advise the Exchange* that should the concentration persist, the Association would be forced to consider increasing its own margin requirements. Weinstein so advised MacDonald in two letters, both dated August 16, 1963.

The record of a September 23, 1963, Exchange-Association meeting, in a section entitled "Relationship of Exchange and Association" states, in pertinent part:

"(B) Association has jurisdiction only over its Clearing Members on matters of positions carried and original margin requirements and no jurisdiction over trading procedures, etc.

"(c) To provide effective control, and to safeguard interests of both the Exchange and the Association, close cooperation between them is needed in such matters."

After describing the scale-up system of margining under consideration by the Association, the record states:

"Exchange should consider a similar system of margin requirements in order to reach the customers of Clearing Members who cannot be reached by the Association."

On October 8, 1963, Weinstein reported meeting with the Manager of the Association (defendant Boyer) and with the President, Treasurer, and Managing Director of the Exchange, (defendants MacDonald, Fashena, and Berg), and discussing margin requirements. The officers agreed that the Association ought to act first "in view of the dangerous situation" created by cottonseed oil concentration. Following the report, a scale-up system was adopted, effective November 15, 1963. On October 10, 1963, Weinstein met with Jack Stevens, the Operations Manager of Haupt, at Stevens' initiative. Weinstein informed Stevens that the margin increase would not be rolled back, questioned him about Haupt's handling of the Allied account, and impressed upon him the seriousness of "the situation."

One last objective fact tending to establish a partnership in regulation between the Association and the Exchange is the fact that the Association's board of directors met with the Exchange Executive Committee on November 19, 1963, at which meeting it was effectively decided that trading should be suspended the following morning.

Board of Trade v. Wallace, 67 F.2d 402 (7th Cir.), cert. denied, 291 U.S. 680, 54 S.Ct. 529, 78 L.Ed. 1067 (1933) suggests that a clearing association performing functions essential to trading on a contract market (i. e. exchange) may be subject to the purview and responsibilities of the Act. *Wallace* involved an appeal from an order (of a Commission constituted under the Grain Futures Act, the predecessor statute of the Commodity Exchange Act) suspending the Board of Trade's designation as a contract market for 60 days because of the Board of Trade Clearing Corporation's refusal to admit the Farmers National Grain Corporation to membership. Pointing out that it and the Clearing Corporation were distinct entities incorporated in different states, the Board of Trade argued that it was not responsible for the Clearing Corporation's denial of membership. The Court disagreed, observing that "[t]he right to *clear* trades made on the board cannot be separated from the right to *make* trades on the

board without seriously impairing market facilities." *Id.*, at 406 (emphasis added).

The court focussed on the relationship between the two corporations.

"The chronology of events strongly suggests that the board, with design to place this essential facility or privilege of a contract market beyond the control of the Secretary of Agriculture, abandoned the practice of itself clearing the trades by creating a separate corporation to take over this function.

"But in view of all the facts it is plain that . . . in reality the clearing of trades remained as completely as ever before within the absolute power and control of the board." *Id.*, at 406.

For example, a board rule stated that board member's trades had to be cleared through the clearing corporation. "Membership in the clearing corporation, the personnel of its board of governors, its by-laws, rules, and regulations, remained and are at all times under the control of the Board of Trade." *Id.* In fact, the clearing corporation could not amend its by-laws without the consent of the Board of Trade. Finally, the Board, through action by twelve of its directors, could discontinue the practice of clearing trades through the corporation.

The record in the instant case does not reveal a parallel dominance by the Exchange over the Association. Moreover, the precise principle enunciated in *Wallace* is that, given the domination and control there in existence, *the clearing house's act* is deemed to be the act of the exchange. It does not necessarily follow that the *exchange's duties* are also duties which the clearing house must fulfill. Nevertheless, the *Wallace* case does underscore the functional inter-relationship of the Exchange and the Association.

The critical question is whether a determination that the obligations imposed by the Act run to the Association would

have the effect of reinforcing the Congressional purpose embodied in the Act. The answer would of course be negative were the Association lacking in ability and capacity to help regulate the market. But the very fact that the Association creates and administers margin requirements, together with the reality that it acts in concert with the Exchange in overseeing the market, suggests a positive answer. Moreover, while placing such a burden on the Association has the salutary effect of making its officers aware of their public trust and the role they can, in fact, *should* play in protecting those who invest in the commodity futures markets, such an imposition creates no discernible disincentive to prudent and effective regulation of those markets.

*Liability of the Corporate (and Partnership) Defendants*

In Vandervelde v. Put & Call Brokers and Dealers Association, 344 F.Supp. 118 (S.D.N.Y.1972), an action for unlawful suspension from membership was brought against the Put & Call Brokers and Dealers Association (PCBDA) by one of its former members and two of the corporations through which he conducted business. Defendants included the PCBDA, thirteen of its members, and eight put-and-call firms associated with those members. As is the case with the Produce Exchange, the PCBDA was made up entirely of individuals, so that a corporation engaged in the put and call business could become an associated member and thereby entitled to enjoy the facilities of the PCBDA only if one of its executive officers was a member.

In finding certain (but not all) of the put and call firms liable, *Vandervelde* set guidelines for the imputation of liability from individuals to firms:

"Each of the individual defendants liable was a principal of one of the broker-dealer defendants with the exception of Harnden and Linburn who were the president and secretary of the Association, respectively, and

members of stock brokerage firms. The evidence clearly indicates that the activities of the individual defendants in the management of the Association were well within the scope of their authority from the firms they represented; indeed in most cases the firms were dominated by these individuals and they managed the Association as well. [citation omitted]. While it may be true that authority to commit tortious acts is not lightly assumed, United States v. Ward Baking Co., 243 F.Supp. 713, 718 (E.D.Pa.1965), the nature of the relationship between the firms and the Association justifies a finding that the participation of option brokers and dealers in the activities of the Association was an integral part of their employment in the industry. Moreover, the firms had a direct interest in the subject matter of the Vandervelde controversy.

"The Court concludes that the conduct of the individual defendants found liable is properly imputed to the broker-dealer defendant firms [citation omitted]." (at 156).

■ The PCBDA, like the Produce Exchange, is a highly organized regulatory body with firm control over its members and the market it polices. Id., at 128. Although *Vandervelde* did not involve a cause of action for failure to fulfill regulatory duties, the guidelines there developed for imputation of liability are but an application of general rules of agency, see Restatement, Second, Agency §§ 216, 219, 228–236, and are well suited to the case at bar. Thus, if a defendant here is found liable, that liability may be imputed to his firm if the actions or inaction from which liability flows were within the scope of his authority.

§ 7 of the Exchange By-laws states, in pertinent part:

"The Nominating Committee shall, in preparing a slate for election to the Board of Managers, fairly apportion the nominees among the various branches of trade interests in the Exchange. Such fair apportionment shall be observed in the preparation of any slate of independent nominees. The Board of Managers . . . shall have the power to exclude nominees and/or to add other nominees, and to adopt such restrictions or regulations in respect to voting on nominees as may in its judgment be necessary or desirable to insure such fair apportionment."

It therefore appears that members of the Exchange Board in some sense serve as representatives of their firms' trade interests, if not as representatives of their firms.

Merrill Lynch, in its statement filed pursuant to Local Rule 9(g) said: "3. . . . In addition, Anderson, *as a representative of Merrill Lynch*, was a member of the Board of Managers of defendant New York Produce Exchange . . . ." (emphasis added). While this "admission" is much too ambiguous to establish, without more, that Anderson's Exchange activities came within the scope of his employment at Merrill Lynch, it suffices when taken together with the fact that Anderson was in charge of Merrill Lynch's Commodities Division, to establish a genuine issue of material fact in respect of whether any liability attaching to Anderson should be imputed to Merrill Lynch. On the other hand, plaintiff's chances for success at trial, even at the directed verdict stage, are diminished somewhat by the fact that Merrill Lynch neither had a business relationship with Allied, nor traded on the Exchange for its own account, nor in any other way appears to have had a direct interest in how the Exchange was regulated. The fact that Anderson declined to serve on the Control Committee because of a possible conflict between its duties and his obligations to Merrill Lynch suggests that he was scrupulous about serving only one master at a time, although a contrary inference is possible, viz. that while serving on the Board he was acutely aware that he served "as a representative of Merrill Lynch."

Defendant I. Usiskin & Co. traded exclusively for its own account. However, between November 14–20, 1963, its net position in cottonseed oil futures was rather small, ranging from net long five contracts on November 14 to net short eleven contracts or November 15. Defendant Fashena, one of two general partners in the firm, maintained a small personal speculative account which was reflected in Usiskin's accounts. His position was net short two contracts on November 13, 1963, and thereafter he did not trade again.

Usiskin in its 9(g) Statement asserted:

"6. . . . [Fashena] did not want to be a member of the Board because it would take up too much time. He discussed this with Usiskin who thought he should accept the position of member of the Board and he did so."

According to Fashena, Mr. Usiskin thought that he "owed it *to the Exchange* to serve" whenever he could. (Emphasis added). They never discussed the value *to the company* of his service on the Board, nor for that matter did Fashena discuss with anyone at Usiskin any actions discussed, contemplated or taken by the Board, nor any knowledge gained by being on the Board, nor did he discuss the positions he had taken or should take on issues before the Board. Fashena's membership was obtained at the request of Usiskin, and was paid for by the company. He was aware of the Exchange policy of apportioning Board membership among the various trade interests, and felt he "was elected to voice the opinions of" small, independent clearing members. "There aren't too many independent clearing members available, so that the few members that do perform these functions feel that they ought to serve on boards and on committees."

The above, while far from compelling, creates a genuine issue of material fact in respect of whether liability should be imputed from Fashena to Usiskin.

Defendant Fahnestock points to several factors which in its opinion demonstrate that MacDonald's actions as President of the Exchange were not within the scope of his Fahnestock employment. MacDonald was President of the Exchange for a year before becoming manager of Fahnestock's commodities department. In that latter capacity, he was not a partner, but rather was strictly salaried. He owned his own self-guaranteed Exchange membership (i. e., Fahnestock did not assume his obligations, nor derive membership for itself through MacDonald), and paid his own dues. He reportedly never discussed Exchange business with anyone at Fahnestock. The company did not trade heavily in cottonseed oil futures, and between November 14, 1963 and November 20, 1963, did not trade for profit. Plaintiff does not challenge any of the above, but apparently relies on "the nature of the relationship between [Fahnestock] and the Exchange and Association." Stated more concretely, plaintiff contends that "participation in activities of the Exchange is an integral part of employment in the industry, or at least the record establishes a genuine issue of material fact in this regard."

Nothing in the record supports so sweeping an inference. Many firms "employ[ed] in the industry" were not involved, even indirectly, in the management of the Exchange. Nor has plaintiff demonstrated that the structure of the oil futures industry is such that those firms whose employees do participate in Exchange management necessarily, or even probably, participate as "an integral part of employment." Accordingly, Fahnestock's motion for summary judgment is granted.

Bunge Corporation was principally engaged in exporting agricultural commodities including vegetable oil. It bought vegetable oil from, sold oil to, and extended credit to Allied. As Bunge's President, defendant Klein's duties included general supervision of Bunge's business activities. On November 14 or 15, Klein advised subordinates at Bunge

that he anticipated a market decline, and instructed them to hedge the company's long cash position by going short in futures. According to Bunge Vice-President Harry D. Fornari, Bunge went from "overall" net long (meaning that its long cash oil position exceeded its short futures position) on November 15, to "overall" net short at the close of trading on November 19. Between November 14–19, Bunge bought only five cottonseed oil futures contracts for its own account, and sold 258, thereby increasing its net short futures position by 138%. Bunge's profit in the declining futures market, based on the settlement prices fixed on November 20, was $559,824. Undoubtedly that profit was in part offset by losses in the cash market. However, at the very least these figures give rise to an inference that Bunge "had a direct interest" in the fact that trading was closed out on November 20, rather than November 14. Taken together, the above creates a genuine issue of material fact in respect of whether liability should be imputed from Klein to Bunge.

Like Bunge, Continental was a corporation principally engaged in exporting agricultural commodities. Like Bunge, it bought vegetable oil from, sold vegetable oil to, and extended credit to Allied. Vogel, Continental's Executive Vice President, was not involved in its vegetable oil trading, but rather concerned himself solely with its grain operations. He asked Continental's President, Michel P. Fribourg, for permission to serve on the Exchange board and as an Exchange Officer. Fribourg granted same, with knowledge that the Exchange regulated an industry in which Continental was involved, because, says Fribourg, he considered service on the Board a public duty.

Between November 14–19, Continental did not increase its net short futures position, but in fact decreased it by purchasing more contracts than it sold. Even so, it managed to profit $2,259,-894 in the declining futures market. Continental contends that it experienced a "loss" because of the market decline. However, the purported loss proves to be nothing more than the difference between the profit Continental in fact made and the profit it would have made had its net short position been the same on November 19 as it was on November 14. This seeming lost profit does not prove that Continental had no interest in forcing a market decline—that would be conclusively proved by computing the profit to be made on November 14, based on the settlement price *on the 14th,* and arriving at a figure greater than $2,259,894—but it does suggest at the least a lack of greed. Continental implies, without offering proof, that its entire imputed profit was offset by losses in the cash market. Even so, the pertinent factor in determining whether Continental benefitted from the decline is whether between November 14 and 19 its "overall" net position (cash and futures) changed significantly, short or long.

If plaintiff has created a genuine issue in respect of imputation of liability from Vogel to Continental, he has barely done so, particularly in light of Vogel's apparent isolation from the company's oil activities, and the fact that no evidence has been adduced to indicate that Vogel discussed Exchange matters with anyone at Continental. Certainly on the record as it presently exists, it would be unwarranted to allow the imputation issue to go to the jury. However, because Continental traded for its own account, and did, as the facts presently appear, make a profit on the market decline, and because Vogel was an active Exchange participant during the relevant period, I conclude that a genuine material factual dispute exists, and am compelled to wait until plaintiff's proof is in at trial before deciding whether it has established a case legally sufficient to go to the jury.

*Individual Liability*

■■■■ Defendants Continental and Vogel argue that under § 46 of the New York Membership Corporation Law as it

existed in 1963, directors of a membership corporation are not personally liable, absent fraud or bad faith, for their corporation's debts, obligations or liabilities. Since the Exchange was organized under that statute, defendants argue, so much of the complaint as alleges a negligent failure to regulate does not state a claim against the board directors. However, plaintiff here does not seek to hold the individual defendants liable for the Exchange's obligations, but rather for their own allegedly tortious conduct. And "a director's common law liability for his tort persists although it may be within the scope of his corporate duties and in furtherance of the objects of the corporation. [citations omitted] . . . Where, as here, the same cause of action lies both against the corporation and against its directors personally, the statute [§ 46] would seem needless and should therefore be interpreted as inapplicable." Faulk v. Milton, 25 A.D.2d 314, 268 N.Y.S.2d 844, 847 (1966).

▮ Defendants Bunge and Klein, relying on Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973) (*en banc*), assert that "outside" directors are not liable for corporate violations of federal legislation, absent knowledge of or actual participation in the alleged wrongdoing. *Lanza* decided in the negative the question whether SEC Rule 10b–5 imposes on directors *qua* directors (hence non-participants in challenged transactions) a duty to insure that all material adverse information is conveyed to prospective purchasers of stock of the corporation on whose board they sit. Assuming *arguendo* that *Lanza* is applicable to the case at bar, defendants have in no way indicated why Klein should be considered an "outside" director, except that from November 18–20, 1963, he was literally outside the country. Upon his return he approved the Exchange actions taken during his absence.

Prior to his trip abroad, Klein admittedly was a participant in what plaintiff cites as a key transaction in the alleged failure to maintain an orderly market. Klein was apprised by Anderson on November 13th that Allied might have achieved a corner, and the two of them urged Berg to contact the Administrator of the CEA and determine from him the precise size of Allied's holdings. (see record citations, *infra*). Earlier in the day Klein had learned from DeAngelis that Allied owned between six and eight thousand contracts in both cottonseed and soybean oils. Klein also knew that Bunge itself held 2,500 soybean oil and 1,000 cottonseed oil contracts for Allied. The next day, according to Klein's 9(g) statement, the Board of Managers was informed by Berg "there there was a large concentration in one individual of the open long futures contracts in cottonseed oil on the Exchange." Thus, at the outset of what plaintiff regards as a crucial period, November 14–19, Klein was an active participant in the Exchange's regulatory efforts.

### The Summary Judgment Standard to be Applied

▮ Plaintiff cites abundant authority for the prevailing rule in respect of summary judgment in antitrust cases.[7] The rule and its rationale were stated succinctly in Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S. Ct. 486, 7 L.Ed.2d 458 (1962):

"We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for

---

7. Inasmuch as the factual predicate for Count One is substantially identical to that for Count Two, at least insofar as malfea-

sance is claimed, the "antitrust rule" is appropriately applied to Count One as well as Count Two.

trial by jury which so long has been the hallmark of 'even handed justice.' " *Id.*, at 473.

Against the *Poller* case and its kindred, defendants line up First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L. Ed.2d 569 (1968), in which the United States Supreme Court affirmed the district court's grant of summary judgment. The Court took pains to distinguish *Cities Service* from *Poller*, and indeed, the facts in *Cities Service* suggest that it may be *sui generis*.[8]

In *Cities Service*, plaintiff's amended complaint left him with the bare allegation that Cities Service Company's cessation of a course of conduct was *by itself* sufficiently probative of a conspiracy to entitle him to resist summary judgment. Only after the court determined from conclusive documentation that that singular fact *could not* give rise to an inference of conspiracy did it grant the motion. In affirming the grant, the Supreme Court did not view itself as limiting the rule enunciated in the *Poller* case, and therefore *Poller* still stands and controls the instant case.

■ This does not mean, of course, that summary judgment is never justi-fied in cases like the instant one. Rather, "[t]he question whether summary judgment is appropriate in *any* case is one to be decided upon the particular facts of that case." First National Bank of Arizona v. Cities Service Co., *supra*, at 259 (emphasis added).

*Summary Judgment*

The court is informed that in this action alone, more than 75 days were devoted to deposition taking, resulting in more than 10,000 pages of testimony. In addition, more than 400 transcripts of various other depositions, inquiries, and proceedings arising out of the salad oil swindle have been made available to the parties here, as have hundreds of documents and records. The parties have, together, pared down the record for purposes of these motions by designating approximately 6,000 pages of testimony and less than 200 documents and records as germane to summary judgment determination. In addition, the parties have, among them, submitted 14 memoranda of law. By and large, the designated portions of the record constitute the case plaintiff intends to present at trial, although he reserves the right to call one or more expert witnesses as well.

---

8. *Cities Service* involved an antitrust action brought by a private party, one Waldron, against 7 large oil companies, alleging in Count Two that in the early 1950's Waldron entered into a contract to purchase Iranian oil over a five-year period at very low rates; defendants other than Cities Service (C.S.) conspired to prevent Waldron from selling the oil which it could acquire under that contract; C.S. negotiated extensively with Waldron with an eye toward acquiring Iranian oil, but broke off dealing and joined the conspiracy as a result of having received a bribe, to wit, a large supply of oil from Kuwait at a price even lower than Waldron could offer; defendants entered into a consortium agreement in 1954 parcelling substantially all the Iranian oil production, and C.S. was permitted a share therein.

Four years after the action was brought, C.S. moved for summary judgment on the basis of affidavits and documents demonstrating that it had begun negotiating the purchase of Kuwait oil in 1948, long before Waldron negotiated his purchase contract, and that a substantially final agreement had been reached prior to the time Waldron approached C.S. The evidence further demonstrated that C.S. commenced negotiations to participate in the consortium two years *after* it allegedly joined the conspiracy, and that the share it was eventually offered was less than substantial.

The court postponed determination of the summary judgment motion to permit further discovery by Waldron of C.S. personnel. Plaintiff subsequently filed an amended complaint in which all references to the Kuwait and consortium payoff theories were dropped, and a more generalized claim of conspiracy substituted, on the theory that the mere cessation of a course of conduct was sufficient evidence of conspiracy to withstand summary judgment.

The additional discovery further disproved plaintiff's assertions. C.S. had actually resisted the formation of the consortium, to the point of seeking intervention by the U. S. Government. C.S. renewed its motion twice more, and ultimately the court granted it.

Having examined the nearly exhaustive and clearly exhausting designated record, and ever mindful that facts and inferences are to be viewed and drawn in the light most favorable to the plaintiff, United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Adickes v. Kress & Co., 398 U. S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the court makes the following determinations.

*The Exchange*

█ Focussing first on the year 1963, prior to November 14, certain essentially undisputed facts can be lifted from the record. During the summer, probably July, following a discussion with MacDonald, Managing Director Carl R. Berg contacted the CEA in an effort to ascertain whether Allied's total position was "untenable," i. e., "too big for the size of the market." (MacDonald EBT, pp. 37–43).[9] The CEA declined to furnish such information. In August, in his capacity as Clearing Association President, defendant Weinstein wrote two letters to MacDonald in his capacity as Exchange President. The letter marked plaintiff's exhibit 10 begins:

"Dear Mr. MacDonald:

The Board of Directors of this Association feels some apprehension over the increasing concentration of contracts in the hands of a relatively few Clearing Members. Large offsetting positions are established by apparently affiliated interests through the medium of "Ex-Pit" transactions and are often liquidated by the same method. We believe this situation to be unhealthy, and are concerned that the position of the Exchange and of the Clearing Association may be jeopardized.

We respectfully suggest therefore that the Board of Managers investigate this situation . . . ."
Plaintiff's exhibit 11 is more direct:

"Dear Mr. MacDonald:

The September, 1963 cottonseed oil open interest is concentrated in the hands of a relatively few Clearing Members. We consider this situation to be potentially dangerous, and feel that the Exchange may desire to take some action to require carrying Clearing Members to call their customers for additional margin on these contracts.

. . . . . .

According to MacDonald, he did not receive these letters until September because illness and a vacation kept him out of the office during the last half of August. (MacDonald EBT, p. 315).

On September 23, the first paragraph of plaintiff's exhibit 10 was incorporated whole as the first paragraph of the record made of a joint Clearing Association/Exchange meeting. (Plaintiff's exhibit 29A). On October 8, the Clearing Association, after consulting with and mindful of the interests of the Exchange, adopted a "scale-up" system for original margin. The Association's action was prompted by "the dangerous situation created by the continuing increase in the Cottonseed Oil interest . . . arising primarily from the activity of a few firms and concentrated in their hands." (Plaintiff's Exhibit 13).

The continuing increase in the open interest was a matter of public record. Among the publications carrying such information was a United States Department of Agriculture (USDA) monthly report entitled "Commitments of Traders in Commodity Futures" (Plaintiff's Exhibit 2). The USDA publication was

9. Transcripts of depositions taken in connection with the instant action are denominated ———— EBT, p. ——. Examinations taken pursuant to § 21A of the Bankruptcy Act appear as ———— 21A, p. ——. Depositions taken by American Express Co. pursuant to a stipulation are denominated ———— Amexco, p. ——. Testimony before the Attorney General of the State of New York appears as ———— Att. Gen., p. ——.

based on information supplied by the CEA. It gives a month-end breakdown of the number of contracts held by large and small traders in various commodities and markets. A "large trader" in cottonseed oil futures is one whose total position equals or exceeds 25 contracts. "Small traders" are not required to file reports with the CEA, but their position is derived by subtracting the commitment of large traders from the total open interest. The aggregate figures for large traders are subdivided into contracts held for speculation and those held for hedging purposes.

Hankin's Exhibit 3 is abstracted from such USDA monthly reports, and shows the commitments of traders in cottonseed oil futures during the first ten months of 1963. The total interest increased from 5,624 contracts on January 31, to 10,071 contracts on October 31. On November 15, a peak of 11,814 contracts was reached, the largest position in twelve years. As the size of the market increased, its composition changed. From January through June, the percentage of the long interest held by large traders averaged 58.2%; from July through October, it averaged 91.-3%. The short side of the market did not show a parallel dramatic increase in concentration by large traders. However, the significance of this is diminished by the fact that the short interest was, from the beginning, more concentrated than the long. From January through June, the percentage of the short interest held by large traders averaged 83.7%; from July through October it averaged 91.1%.

The ex-pit transactions mentioned in the first Weinstein to MacDonald letter continued during the Fall and were unprecedented in number and size. (Hankin EBT, p. 61; Stafford Amexco, pp. 1260–63; MacDonald EBT, p. 273). For example, on September 26, ex-pit transactions involving 2400 contracts were consummated, which figure constituted approximately one-third of the entire open interest. Seventy-three percent of the reported sales that day were

effected outside the trading ring. (Hankin EBT, pp. 66–67). It was commonly believed that Allied was responsible for the increase in ex-pits, a conclusion bolstered by the fact that it was one of the few houses large enough to deal in such quantities. (Hankin EBT, p. 72). Traders on the Exchange floor discussed which clearing members were engaged in ex-pits, and MacDonald believed Haupt was among them. (MacDonald EBT, pp. 269–271).

Sometimes transactions are handled ex-pit because their sheer magnitude would distort market price were they handled on the floor. (Stafford Amexco, p. 1241). Such trades, if effected on behalf of a single customer, necessarily increase market concentration and decrease liquidity. Excessive ex-pitting also is potentially destructive of an orderly market because traders are thereby enabled to avoid margin requirements, although they must report their transaction to the Exchange pursuant to Rule 6 of its Rules Regulating Transactions in Cottonseed Oil Futures Contracts.

Not only did trading via ex-pits increase, but the overall volume of trading was exceedingly high during the Fall. (Hankin Exhibit 1). The record also contains some evidence that during this period price fluctuations were quite wide, (Stafford EBT, p. 168), and price levels increased steadily (Anderson Att.Gen., p. 4), in part because Allied paid higher prices for contracts than did other traders. (Hankin EBT, p. 30–31).

In late Summer and early Fall, the Exchange conducted a very limited inquiry into Haupt's relationship with Allied. On or about September 5, Haupt became Allied's broker when it received in an ex-pit transaction contracts which Ralph Peters & Co. had been carrying for Allied. Shortly thereafter, with the encouragement of MacDonald, Berg called on Jack Stevens, Haupt's controller and commodity department head. Berg warned Stevens about the riskiness of futures trading and asked him if he

knew what he was doing. Stevens assured Berg that he did. (Berg EBT, 294–299).

A day or two later, after again conferring with MacDonald, Berg met with DeAngelis to seek corroboration of Stevens' representations in respect of margins, collateral, and the legitimate hedging function of Allied's position. DeAngelis so confirmed. (MacDonald EBT, pp. 58–65). On October 10, Berg again met with Stevens, this time at Stevens behest, and during the course of the conversation inquired whether the Allied account was being handled properly. (Berg EBT, 451–53).

According to Berg, this series of meetings was motivated by the fact that, notwithstanding its competence and experience on the New York Stock Exchange, Haupt was "relatively speaking a new face in the [cottonseed oil futures] picture." In addition, Allied was not a member of the Produce Exchange, hence the Exchange had little information from which it could make a judgment about Allied's financial responsibility. (Berg EBT, p. 294, pp. 299–300). According to MacDonald, the inquiry was made because Haupt "hadn't been a known name regularly in the business." (MacDonald EBT, p. 54).

The record includes facts or assertions of fact from which another motivation —viz., concern about whether DeAngelis was, in general, trustworthy—might genuinely be inferred. For example, during 1963, MacDonald had heard that a DeAngelis company had gone into receivership while facing SEC charges and that subsequently DeAngelis paid off his debts; DeAngelis had paid certain penalties to the federal government in connection with an export shipment; DeAngelis had been in "trouble" with the government in connection with "packaging" products for the federal school lunch program; he had been charged with federal income tax evasion and a tax lien had been entered against him; Shearson, Hammill & Co. had refused to do business with him; and that De-

Angelis had been suspended from the Chicago Board of Trade in early 1963, for engaging in a wash sale. (MacDonald EBT, pp. 96–102). Prior to the meetings with Stevens, Berg had heard that one of DeAngelis' companies had gone through a reorganization; DeAngelis wound up with a debit balance in some futures transactions which he paid personally; there were a number of persons who wouldn't do business with DeAngelis but subsequently "he had cleared up all the debts" and "everybody in the business was doing business with him and . . . he was becoming an increasingly large trader in the fats and oils business." (Berg EBT, pp. 293–303).

Thus, a combination of facts and genuine assertions of fact—the substantial increase in the size of the open interest; the growing overall concentration in the long interest; Allied's dominance of the long side of the market; increased trading volume; the unusual number and size of ex-pit transactions; the rise in prices and their instability—all of which were made known to Berg or MacDonald, or were readily available matters of public record, when viewed in the context of what was known about Allied's past business practices and present commitments give rise to a genuine inference that sufficient warning signs existed to trigger a statutory duty on the part of the Exchange to at least determine in an organized and thorough fashion whether Allied's activities threatened maintenance of an orderly market.

Turning to the November 14–19, period, certain facts are essentially undisputed. On November 13, Anderson received a report from James E. McHale, the manager of Merrill Lynch's Fats and Oils Department, that Allied appeared to have garnered half of the combined cottonseed and soybean oil futures market. (Anderson 21A, p. 103). For weeks prior to that date, Anderson had received numerous reports that Allied was amassing an extremely long position in cottonseed oil futures, and reports from

the Exchange floor about continued buying by brokers presumed to be acting on Allied's behalf. (Anderson Att.Gen., pp. 6-7). The cumulative effect of McHale's and the earlier reports was to make Anderson fearful that an "excessive position" had been accumulated, (Anderson Att.Gen., p. 7), and that a corner was being allowed to develop which would constitute a violation by the Exchange of the Act. (Anderson 21A, p. 248).

Anderson went straightway to see Klein, who was the nearest (geographically) Exchange manager, and related to him his fears. (Anderson 21A, pp. 103-304). Klein suggested they find out from the CEA through Berg the precise dimensions of Allied's position. They contacted Berg, who in turn contacted the CEA, and received back a commitment to provide the requested information the following morning. (Anderson Att.Gen., pp. 10-12, 2a). On November 14, the CEA reported to Berg that Allied held approximately 90% of the open interest in cottonseed oil futures. (Plaintiff's Exhibit 14). This information was passed on orally to MacDonald and Anderson. (Berg EBT, 1025).

That afternoon, a special meeting of the Exchange board was held, at which Berg stated that Exchange officials were gravely concerned "over the large number of open long contracts reportedly held by a concentrated interest." MacDonald then announced the formation of a Control Committee "invested with all the power and authority of the Board to call for such information, reports, presentation of records, evidence and testimony, as may, in the Committee's opinion, be necessary to determine the facts surrounding the large concentration of open long interests." (Plaintiff's Exhibit 15). A resolution establishing the Control Committee passed unanimously. The following day a notice was sent over Berg's signature to all clearing members directing that they prepare by the close of business a list of customers, and that a report containing certain specified information be deliv-

ered to the Exchange by November 20, 1963. (*See* Defendant's Exhibit 9). According to Anderson, "there was never any doubt in anybody's mind they were talking about Allied" at the meeting on the 14th. (Anderson Att.Gen., p. 36a).

After learning how large Allied's position was, Anderson called Caldwell at the CEA and sought his advice about what the Exchange should do. (Anderson Att.Gen., p. 56). Caldwell memorialized the conversation in a memorandum to "the files," (Anderson's Exhibit 11), in which he recounts, *inter alia*, that "Anderson said that he was very much afraid that Mr. DeAngelis had over-extended himself to the point where he is in danger of bankruptcy, and that if he is forced into bankruptcy it will have a widespread effect upon others who may be financing him." Caldwell notes that he advised Anderson "it might be well for the committee to determine whether the situation is sufficiently grave for the Exchange to close trading and establish a settlement price for the open contracts." This advice Anderson communicated to the Exchange board some time between November 14-19, (Anderson EBT, p. 279), very possibly during the meeting on the 14th. (Anderson Att.Gen., p. 56). Berg received similar, if not more emphatic advice from Caldwell at about the same time. (Berg EBT, pp. 578-79).

On November 15, Caldwell telephoned Anderson to learn what steps the Control Committee had taken and, because Anderson had resigned from the Committee, was referred to MacDonald. He thereupon placed the first of two calls to MacDonald and, according to a memo to the files dated November 15, (Anderson's Exhibit 12), was told that the Committee had "issued a call" to all clearing members, and "[did] not plan to take any further action in this matter until the information obtained in the call has been analyzed." The memorandum continues:

"I pointed out to Mr. Macdonald that the exchange has a responsibility un-

der the CEA to prevent squeezes and corners, and asked him whether the Control Committee had given any consideration to this responsibility. He said that the committee had considered this point but felt that in view of the carryover of oil and the current high level of production, there was no danger of a corner. I asked Mr. MacDonald if his committee was at all concerned by the fact that one individual held more than 90 percent of the positions on the long side of the futures market. He said that during the latter part of the season such a concentration would worry him but at this time, at the height of the production, he does not see much danger in this. He said it appeared to him that this happened to be just a good opportunity for people who wanted to sell oil."

MacDonald also reportedly stated his understanding that DeAngelis' position had been sharply reduced on the 14th as a result of an ex-pit transaction involving 2,500 contracts for December futures and a transaction of similar size in March futures. Both transactions were being checked by the Exchange for authenticity.

After discussing the situation with Assistant Secretary of Agriculture Mehren, Caldwell again telephoned MacDonald, and relayed Mehren's feeling "that the exchange should take prompt action to bring about an orderly reduction in Mr. DeAngelis' positions." (Anderson's Exhibit 13). Indeed, Mehren reportedly had directed Caldwell to call to MacDonald's attention § 5d of the Act, which places upon exchanges a duty to prevent manipulation and cornering. MacDonald reiterated his intention to wait until the results of the Control Committee's call for information from clearing members had been analyzed before taking further steps. Caldwell rejoined that he doubted any new information would be forthcoming, hence immediate consideration of what action to take seemed advisable. MacDonald agreed to contact Berg no later than

Monday the 18th "to try and lay some plans," and suggested he might immediately call DeAngelis and request that he voluntarily start reducing his holdings. Caldwell stated that between calls to MacDonald he had learned that the ex-pit transactions discussed in the earlier conversation "merely involved the switching of a long position of 2,510 tanks from the December future to the March future. I told Mr. MacDonald that this would not seem to help the situation . . . . ."

On November 16, officials of various commodity exchanges across the country attended a conference at New York's Biltmore Hotel, during the course of which MacDonald and Bernard Carey, the chairman of the Chicago Board of Trade, had a private conversation in Anderson's presence concerning Allied's vegetable oil positions. (Anderson Att. Gen., p. 6b). Apparently, no conclusions were reached or joint strategies worked out. On November 18, the sharp drop in the market and a rumor that Haupt had refused to accept certain contracts led MacDonald to discuss with DeAngelis the latter's ability to support financially his position. DeAngelis replied that he couldn't withstand a further substantial break in the market, and that a drop of $\frac{1}{8}$th cent per pound would deplete his cash reserves. (MacDonald EBT, pp. 123–125). Consequently, after the close of business, MacDonald, Berg, Anderson and Vogel spoke to each other in round robin fashion on the telephone and, acting as a quorum of the Executive Committee, agreed to fix a 25-point limit on price fluctuations, effective upon market opening on the 19th. (Berg EBT, p. 852; Plaintiff's Exhibit 25).

On the morning of the 19th, representatives of Haupt came to Anderson at Merrill Lynch, and asked him to help Haupt find someone to take over its position. Anderson made several unsuccessful calls to prospective buyers. Ultimately, he decided that a liquidating effort on Haupt's behalf would create a conflict of interests in respect of Merrill Lynch's efforts, commenced about mid-

day, to liquidate soybean oil contracts for Bunge. (Anderson Att.Gen., pp. 23a–26a).

These, then are the major events leading up to the joint Exchange-Association meeting at the close of business on the 19th at which it was, as a practical matter, decided that trading should be suspended and settlement prices fixed, a decision formally reached on the morning of November 20. Plaintiff urges that the Exchange's failure to suspend trading during the November 14–19, period reflects a conscious decision to allow a price decline so that the short interests, persons who had agreed to sell at pre-decline price levels, might benefit. Among the facts outlined above which taken together support an inference of impure motivation are that on the 14th Berg received from the CEA a list which included the positions of the 21 largest traders, which arguably armed him with detailed enough information to obviate the need to establish a time-consuming information-gathering Control Committee; that as early as November 14, MacDonald and Anderson learned from Berg the dimensions of Allied's holdings; that early on Caldwell impressed upon Anderson, MacDonald, and Berg the gravity and urgency of the situation they faced, the need for immediate action, and the statutory duty they were under to prevent manipulation and cornering; that until the 19th no serious consideration was given to suspending trading and settling contracts despite Caldwell's repeated suggestions; that as late as November 15, MacDonald reportedly characterized the then evident market crisis as "just a good opportunity for people who wanted to sell oil;" and that even though Anderson reportedly was afraid on November 14, that Allied was "in danger of bankruptcy," no limitation (other than the normal one of 200 points) was imposed on price fluctuations until the opening of the market on the 19th.

Plaintiff observes that a decision to close trading was not reached until Allied had become bankrupt, and Haupt had announced to a joint meeting of the Exchange Executive Committee and Association Board that it would thenceforth be unable to meet margin calls (Plaintiff's Exhibits 17 and 18). It was the consensus of the meeting that such a default "would cause the dumping of huge quantities of cottonseed oil contracts on the market under the default rule [Clearing Association By-law 26] . . . [and] that such action would precipitate a catastrophic decline in values which might well result in the bankruptcy of many other clearing members and trade houses." Accordingly, a resolution suspending trading until further notice, and fixing settlement prices was passed unanimously by the Executive Committee, after touching base personally or via the telephone with two-thirds of the Exchange board. This decision was formally ratified by the Board on the 20th. (Plaintiff's Exhibit 19).

According to plaintiff, the principal difference between November 14, and November 20, in respect of whether trading should have been suspended, concerns who would bear the financial brunt of the sinking market. Defendants permitted the market to fall so long as Haupt and Allied were able to absorb losses, but suspended trading once the defendants themselves faced financial hardship. This, says the plaintiff, is the most flagrant form of bad faith regulation. However, the mere fact that a market declines and, therefore a trader loses money, as is always the case when one miscalculates which way the market will swing, does not *ipso facto* convert a subsequent decision to suspend trading, reached in the face of impending market chaos, into an action taken in bad faith. Nor, conversely, does a suspension of trading under such circumstances convert an earlier failure to take such a step into bad faith regulation. Rather, the issue is whether on either date suspension of trading was justified by what was then known about market conditions.

There can be no doubt that on November 20, suspension of trading was appro-

priate. On that date, defendants knew that a trader holding 90% of the open interest was insolvent, and that the broker through which he traded was teetering on the brink. Plaintiff views these facts solely in terms of whose ox is gored when. However, when viewed in terms of their probable impact on the orderly functioning of the market, Allied's insolvency and Haupt's inability to meet margin calls made the Exchange's action manifestly appropriate. The remaining question, one genuinely in dispute, is whether suspension of trading and settlement of contracts was appropriate on the 14th, given what defendants then knew. A positive answer would give rise to a genuine inference of bad faith regulation.

The Exchange's motion for summary judgment is denied as to Count One.

*Clearing Association*

■ Focusing first on the period up to November 14, the Moore to Weinstein letter concerning firm "N," the Association meeting of August 13, the Weinstein to MacDonald letters, the September 23, joint meeting, the October 8, meeting at which "scale up" margining was adopted, and Weinstein's October 10, meeting with Stevens all underscore the Association's awareness of increasing market concentration and the dangers inherent therein. These meetings and actions indicate that, far from being lax in its efforts to prevent market manipulation, the Association took the lead in drawing attention to the incipient corner being achieved.

Not only did the Clearing Association take one of the few direct regulatory actions available to it when it revised its margin requirements, but in addition at several points it encouraged the party primarily responsible for and capable of regulating the market, viz., the Exchange, to take hold of the situation. True, the Association's "scale-up" system of margining did not go into effect until five weeks after its adoption, but the announcement of its adoption had

the immediate effect of apprising clearing members that the Association regarded "the situation" as a serious one. (Weinstein EBT, pp. 67–68).

Plaintiff has not directed the court's attention to any statement made, or action taken or omitted by the Clearing Association or its officers during the period November 14–19, other than their normal clearance of contracts during the course of which Haupt was called for $12 million in variation margin. The Association was not a party to the decision made on the 14th to appoint a Control Committee and permit trading to continue. Nor were any of its officers in contact with the CEA or with DeAngelis during this period. The bare fact that the Association cleared contracts and called margin during the period is insufficient to give rise to an inference of bad faith regulation.

It is true that on the morning of November 19, the Association's Board of Directors met "to give consideration to the emergency which appeared to exist by reason of the open position held by Ira Haupt & Co. and J. R. Williston & Beane, Incorporated (Williston & Beane), and the sharp decline in the price of cottonseed oil which had occurred on Friday, November 15, and again on Monday, November 18, 1963." (Plaintiff's Exhibit 16). However, the meeting appears to have at most provided an opportunity for Board members to learn from Weinstein, Boyer and presumably Anderson who attended the meeting at the Board's invitation, the precise dimensions and contours of the emergency. The only conclusion reached during the meeting was that it should be adjourned and reconvened at 4:00 p. m., at which time representatives of Haupt and Williston & Beane would be invited. At 4:00 p. m., the Clearing Association Board met jointly with the Exchange Executive Committee and decided to suspend trading and settle contracts.

The Clearing Association's motion for summary judgment is granted as to Count One.

*Weinstein and Boyer*

 Nothing additional need be said about Weinstein. As is clear from the above record citations, he took the lead, with precious few followers, in trying to head off DeAngelis' drive to corner the market. As for Boyer, he appears to have been included as a defendant solely because he was Manager of the Association. Their motions for summary judgment are granted as to Count One.

*MacDonald*

 Little need be added to what has already been said about MacDonald's activity during the period relevant to this action. He was intimately involved in many of the transactions which plaintiff regards as reflecting bad faith. He appears to have been at all times an active, well-informed Exchange President, able to provide effective leadership when he considered it necessary. MacDonald's summary judgment motion is denied as to Count One.

*Anderson*

 As director of Merrill Lynch's Commodities Division, Anderson probably had access to more information about the market and the participants in it than did any other Board member. Merrill Lynch's Fats & Oils Department pursued an "interest" in Allied's activities by keeping track of exporters, receiving reports from exchange floors, following USDA announcements, taking account of internal sales, and analyzing general statistics. (Anderson EBT, pp. 140–41). Based on information supplied by that department, Anderson reached the conclusion that the price of cottonseed oil futures was "too high" between June and November, 1963, and so advised Merrill Lynch's speculative accounts. (Anderson EBT, pp. 177–180). The Manager of the department was McHale, whose report to Anderson on November 13, precipitated Berg's call to the CEA.

In daily contact with McHale was John D. Atkins, Jr., a Senior Account Executive for Merrill Lynch, who followed the daily trading volume reports and monthly "commitments" reports published by the CEA. Atkins heard rumors during the latter half of 1963 that a major trader was accumulating an overwhelming long position in cottonseed oil futures. He viewed the substantially increased overall volume as a partial confirmation of such rumors. (Atkins EBT, pp. 9–11). Anderson also had access to Irving E. Hankin, Manager of Merrill Lynch's Commodity Research Department, who edited commodity opinions and supervised house commodity publications. Hankin apprised Anderson, on or about November 14, that if certain reported ex-pit transactions resulted in DeAngelis taking the long side, a very heavy portion of the long interest would be concentrated in Allied's control. (Hankin EBT, p. 45). In fact, Merrill Lynch's market information was so superior that Continental often used Merill Lynch as a broker rather than trading for itself. (Worthington, EBT, p. 44). Bunge, also, was a large and active Merrill Lynch customer. (Anderson Att.Gen., p. 5a).

Nor was Anderson unaware that DeAngelis' activities should be viewed with a critical eye. In late August or early September he was informed by a CEA official, visiting him on another matter, that the CEA was watching DeAngelis' operations closely. (Anderson Att.Gen., 35a). Anderson knew, in 1963, that the United States government had filed a civil fraud suit against DeAngelis in 1960, in connection with Food for Peace Program shipments of soybean oil to Spain. He also knew that First National City Bank had refused to do business with DeAngelis, as had Merrill Lynch. (Anderson EBT, pp. 338–341).

As detailed above, Anderson was told by Berg on November 14, that Allied held 90% of the open interest. He immediately called Caldwell at the CEA and sought his advice. On November 18, Anderson participated in the decision to limit price fluctuations. On the morning of the 19th, he attended the As-

sociation meeting as a guest, and in the afternoon participated in the joint meeting.

Anderson's motion for summary judgment as to Count One is denied.

*Klein*

As has already been detailed above, Klein was approached by Anderson on November 13, and apprised of the latter's fears that Allied might be cornering the market. (Fornari Amexco, pp. 373–74). Although Anderson indicates that he sought out Klein because he was the Exchange manager nearest in location, it is not unreasonable to assume that Klein was visited in part because Bunge had a business relationship with and held contracts for Allied and, therefore, had some knowledge of the size and nature of the Allied position. (Fornari Amexco, p. 375). In fact Klein did have a general idea of the dimensions of Allied's interest, having been told earlier in the day by DeAngelis that it numbered between 6 and 8 thousand contracts, but did not disclose that fact to Anderson. (Klein Amexco, p. 708). Thus, although Klein was not apprised on the 14th that Allied was the target of the Control Committee inquiry, and was not told the precise size of its position, he knew the former and had a fair sense of the latter.

On November 15, 18 and 19, at Klein's direction Bunge went short, thus benefitting from the market decline. (Fornari Amexco, pp. 378–79, 387). Klein's explanation of why he directed Bunge to sell—because a day or two earlier Russia had withdrawn from negotiations over a Soviet-American wheat deal—is undercut by the fact that as early as September 27, there were hints that rumors of Soviet interest in American edible oils might be unfounded, (Merrill Lynch's Grain & Feed Weekly Letter (G&F)); that by October 2, there was informed skepticism, (Fats & Oils Weekly Letter (F&O)); that by October 23, there was objective evidence to indicate that the rumors were unfounded (F&O); and that by November 8, there

was evidence of strong Senate opposition to the wheat deal, (G&F). Moreover, Bunge Senior Vice-President Brasmer testified that he personally informed Klein *in late October or early November* that rumors of Russian interest in purchasing vegetable oil were ill-founded. (Brasmer EBT, p. 60).

Although Klein did not participate in the actions taken by the Executive Committee and Board on the 19th and 20th, he approved them upon his return from a long-planned business trip. His summary judgment motion is denied as to Count One.

*Vogel*

 As both a Board member, Executive Committee member, and Vice President of the Exchange, defendant Vogel was in a position to keep abreast of factors and events which potentially could have a substantial impact on the markets regulated by the Exchange. However, if his deposition testimony is deemed credible, Vogel was an island of ignorance in a sea of information. He never heard rumors that Allied was accumulating a long position in cottonseed oil futures, nor does he recall ever discussing the nature of Allied's oil activities at any Exchange meeting, or even in informal conversations with Exchange officials or Board members. (Vogel EBT, p. 134). He didn't know prior to November 14, that Haupt cleared trades for Allied, nor that the two companies had a business relationship in addition to that of broker and customer. (Vogel EBT, p. 141).

Vogel also reports that he never discussed Allied with MacDonald; never heard that Berg met with DeAngelis (in September) to discuss Allied's ability to maintain its positions; never discussed Allied with Berg except on November 18, in connection with the limitation imposed on price fluctuations; didn't try to keep himself advised of market conditions, traders' activities, price movements, and the like; didn't read USDA or CEA publications; and made no at-

tempt to obtain information about cottonseed oil futures trading other than by attending Exchange meetings. (Vogel EBT, pp. 140–42). Vogel's reported lack of curiosity persisted even at a time when other defendants were expressing grave concern over the state of the market. On November 18, when Berg contacted him in connection with the price fluctuation limitation, Vogel assented to the limitation without even knowing whether the feared fluctuation was upward, downward, or both. (Vogel EBT, p. 169). Finally, Vogel insists that prior to November 19, he did not even know that Continental had a cottonseed oil futures position on the Exchange. (Vogel EBT, p. 26).

Vogel offers two explanations for his lack of knowledge and his failure to manifest concern: that his responsibility at Continental was limited to grains and did not extend to vegetable oils (Vogel EBT, pp. 22–23); that the Manager of the Exchange, Berg, and its committees were responsible for following futures trading and alerting the Board if anything unusual occurred. (Vogel EBT, p. 143). The first explanation is in part undermined by the fact that Vogel admits to at least some familiarity with Continental's oil activities. For example, he knew that Continental had a business relationship with Allied in cash cottonseed oil, (Vogel EBT, p. 99), and that Continental helped finance Allied's oil ventures (Vogel EBT, p. 135). The second contention is in part belied by the active roles Vogel's fellow officer MacDonald and fellow Board members Anderson and Klein played in tracking the market.

Continental's General Merchandise Division, headed by Ralph Totah, utilized and had access to several sources of information, (Totah EBT, pp. 31–34, 72–73; Stafford Amexco, pp. 1283–84), including sources cultivated by Merrill Lynch (Worthington EBT, p. 48). Totah and his staff knew or believed that Allied was accumulating a large long position, that it was actively engaging in ex-pit transactions, that Haupt cleared trades for Allied, and that trading volume was heavy and price fluctuations wide. (Totah Att.Gen., p. 11a; Stafford EBT, pp. 81–83, 164–168; Worthington EBT, p. 42). However, Vogel had no formal or functional relationship with the General Merchandise Division, and in fact reported directly to Continental's President Fribourg, as did Totah. (Fribourg EBT, pp. 3–5). Fribourg, incidentally, was apprised in or about early June that a USDA official had advised Continental to take care in its dealings with DeAngelis. (Fribourg EBT, pp. 44–45; Sabin EBT, pp. 13–14).

All of the above either supports a genuine inference that Vogel was negligent in failing to equip himself for his regulatory duties, or it reflects a pattern of ignorance or failed recollection which might better be assessed with the aid of demeanor evidence and cross examination. Accordingly, Vogel's motion is denied as to Count One.

*Fashena*

Like Vogel, Fashena was both a Board member, Executive Committee member, and officer (Treasurer) of the Exchange. However, their non-official status differed markedly. The trading firm in which Fashena was a partner, Usiskin, was a comparatively modest company. Its cottonseed oil futures position was small and, during November, close to even, i. e., neither net long nor net short. (Fashena EBT, pp. 9–10). The firm's position included a small personal speculative account for Fashena, which was at all times close to even. (Fashena EBT, p. 31). Unlike some of his colleagues, Fashena lacked access to a broad range of nonpublic market information. Notwithstanding the power presumably inherent in Fashena's triple official capacity, he appears from the record to have been a peripheral figure in the events here challenged. He was not the person others went to for guidance, information, or support on November 13, nor was he asked to serve on the Control Committee, nor was he contacted

in connection with the November 18, price fluctuation limitation. He wasn't someone to whom others turned for advice or with whom others felt obliged to touch base on matters of import.

Nevertheless, Fashena was, like other officers and Board members, under an obligation to maintain an orderly market and prevent manipulation and cornering. Therefore, I cannot hold as a matter of law that Fashena was not negligent in failing to make himself aware of the growing danger to the market or in failing to take a more active role in coping with it. Accordingly, his summary judgment motion is granted only insofar as plaintiff alleges bad faith regulation.

## COUNT TWO

*Existence of a Cause of Action*

■ Defendant Exchange quite correctly asserts that it has the power and has a duty to close trading, excuse delivery, and settle contracts at reasonable prices when in its good faith judgment an emergency so warrants. Therefore, says the Exchange, in taking such actions on November 20, 1963, at the request of the CEA Administrator, it acted within the scope and purpose of the Act, and in furtherance of the objectives and requirements of the Act, and is consequently immune from the operation of antitrust laws, under the doctrine of Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), and Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970). However, defendant either misperceives the nature of plaintiff's claim, or assumes contrary to the record that certain genuine issues of material fact do not exist. Plaintiff quite clearly alleges that the Exchange acted in bad faith, and in violation of, rather than in furtherance of, its duty to maintain an orderly market. Plaintiff concedes that the CEA Administrator requested that the Exchange be closed, but notes that the "request" was made on November 14, yet the Exchange was not closed until November 20.

Thus, plaintiff views the Administrator's request as objective evidence that defendant did *not* fulfill its obligation to prevent manipulation and cornering on November 14, but instead permitted prices to drop sharply until the 20th, when, to protect clearing members other than Haupt, it exercised its emergency powers in bad faith. Even if the record did not establish genuine issues of material fact regarding defendant's bad faith, the Exchange's actions would not be immune to antitrust attack at this stage of the litigation unless it were established beyond dispute that those actions did not go beyond what was necessary to further the regulatory scheme of the Act. Thill Securities Corp. v. New York Stock Exchange, *supra*.

■ Defendants Klein and Bunge assert that there exists no "restraint" upon trade or commerce here as required by § 1 of the Sherman Act, because plaintiff complains that defendants *should have* restrained trade by closing the market on November 14th, and that Haupt was injured by defendants' *refusal* to effect restraints. The argument at best is specious. The entire regulatory scheme administered by the Exchange would constitute a restraint of trade and violation of the Sherman Act were it not for the limited immunity to antitrust challenge necessary to effectuate an otherwise contradictory Congressional Act. To the extent that those charged with regulatory obligations under the Commodity Exchange Act wilfully violate such obligations, the anti-competitive nature of the regulatory scheme persists without the countervailing benefit of achieving the purpose of the Act. Defendants err in separating out closing of the market and settlement of contracts as a restraint, without recognizing that bad faith regulation by the Exchange is itself a restraint of trade.

*Haupt's Misconduct*

The discussion of causation in the context of Count One, *supra*, is equally applicable to plaintiff's antitrust claim. As respects defenses based upon Haupt's

misconduct, their inappropriateness in an antitrust settling is clear. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Lanier Business Products v. Graymar Co., 355 F.Supp. 524 (D.Md.1973). Thus, the Supreme Court in *Perma Life* stated flatly:

> "The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition." *Id.*, at p. 139.

In *Lanier Business Products,* the court declared:

> "In providing for treble damages and equitable relief, Congress targeted the public consequences of anticompetitive market activity. It would be intolerable to excuse the continuation of conduct detrimental to the common good because of the equally egregious actions of another." *Id.*, at p. 526.

### Summary Judgment

The applicable standard has already been set forth in some detail, *supra.* To prevail at trial, plaintiff must prove that a "contract, combination . . . or conspiracy" existed between November 14–20, 1963, to depress market prices in order to benefit the short interests at the expense of the longs, and that it numbered among its participants the defendant whose liability is being determined. Inasmuch as the factual predicate for Count Two is the same as that for Count One, and inasmuch as the bad faith regulation alleged in Count One is substantially the equivalent of the intent to effectuate the object of the conspiracy charged in Count Two, the defendants in whose favor summary judgment has been granted as to Count One are also entitled to summary judgment as to Count Two. Thus, the motions of defendants Clearing Association, Boyer, and Weinstein are granted, as is that of defendant Fashena and the firm to which liability might otherwise be imputed, defendant Usiskin.

Plaintiff, as is often the case, is unable to point to any direct proof that a conspiracy existed. The question, then, is whether plaintiff has presented facts from which the existence of a conspiracy can be inferred. As was the case, albeit to a lesser degree, in the determinations made in respect of Count One, the court is now called upon to determine whether the record contains evidence from which a particular fact may genuinely be inferred, and then assuming the inferred fact to be established, to determine whether a particular further inference is genuine. While recognizing that this pyramiding of inferences—determining whether one possibility spawns another possibility—limits the utility of summary judgment as a device for terminating disputes, it nevertheless appears to the court that a genuine issue in respect of the existence of a conspiracy has been raised.

If there is any validity to what is essentially a self-proving legal maxim that the success of a conspiracy is the best proof of its existence, then we have a starting point. That the market declined substantially between November 14–19, is undisputed, and that the decline harmed those whose interests were net long and benefitted those who were net short, is axiomatic. It is also clear that the remaining defendants had the capacity and capability to influence market prices. The fact that three of them in fact placed a limit on price fluctuations tends to so prove. Thirdly, there exists a genuine dispute in respect of whether at least two of the defendants, Bunge and Continental, benefitted from the market decline.

Several opportunities existed for various of the defendants to reach an agreement tantamount to the conspiracy charged. As detailed above, Anderson and Klein met on November 13, and together went to see Berg. On the 14th, Berg spoke to both Anderson and MacDonald individually about the precise nature of Allied's position. Later that day, at the special Board meeting which Klein attended, the dangerous situation

then existing was discussed in general terms but, according to Anderson, everyone knew that Allied was the party being discussed. At that meeting Anderson relayed CEA Administrator Caldwell's advice that the Board consider closing the Exchange. Although Vogel did not attend the November 14, meeting, and does not recall when he learned the substance of it, (Vogel EBT, pp. 35–36), Anderson has indicated that he must have discussed Allied's position with Berg, MacDonald, *and other members of the Executive Committee*. (Anderson Att.Gen., p. 2b). On Saturday, November 16, Anderson and MacDonald apparently had occasion to speak about the Allied problem while attending a conference at the Biltmore. On November 18, MacDonald discussed with DeAngelis Allied's cash problems, and then related the same to Berg, and to defendants Anderson and Vogel. This double round of telephonic communications resulted in the price fluctuation agreement, which was reduced to writing and signed, thus necessitating further contact among the defendants. On the morning of the 19th, representatives of defendant Bunge were in contact with defendant Merrill Lynch in connection with contracts it wanted liquidated on the Exchange. (Anderson 21A, pp. 318–19).

In addition, the record suggests that the employees of the defendant firms communicated frequently and knowledgeably with each other about Allied's activities, (Worthington EBT, pp. 23–24, 48; Stafford Amexco, p. 1286; Atkins EBT, p. 34; Hankin EBT, pp 16–17), thus giving rise to the inference that the informed suspicions of men like McHale and Hankin were widely shared. When viewed as fact, this inference gives rise to the further inference that defendants knew enough early enough to act more quickly than they did, which in turn permits the inference that they decided not to act with dispatch.

The object of the conspiracy—that the short interests be benefitted—arguably is reflected not only in the actual impact of the market decline, but also in Anderson's statements that the price of futures rose steadily from September into early November, (Anderson Att.Gen., p. 4), and that between June and November prices were "too high"; in MacDonald's statement to Caldwell on November 15, that the situation which Caldwell regarded as dangerous was "just a good opportunity for people who [want] to sell oil"; and in the fact that even on November 19, after several days of falling prices and at a time when suspension of trading was objectively inevitable, Board members were concerned about whether settlement of contracts would be fair to holders of the short interest. (Fashena EBT, p. 456).

The same facts and assertions of fact which were relevant in determining whether plaintiff has genuinely disputed defendants' claimed non-liability under Count One are relevant in determining whether a dispute exists in respect of non-participation in the alleged conspiracy. Without once again plunging into the record, suffice it to say that one of the elements taken into account in assessing the claim of bad faith regulation was whether the defendants actually participated in the challenged events. In the case of each of the remaining defendants the answer was affirmative, and the nature and extent of the participation is such as to raise a genuine issue in respect of who participated in the conspiracy if one existed.

The motions of defendants Exchange, MacDonald, Anderson, Merrill Lynch, Klein, Bunge, Vogel and Continental are denied as to Count Two.

## COUNT THREE

### Statute of Limitations

The Clearing Association's contention that plaintiff's third claim is time barred is easily disposed of. It is true that the Bankruptcy Act applies a two year statute of limitations, calculated from the date of adjudication, to transfers avoided under § 60 of the Act. Here, however, plaintiff proceeds under § 70(e), 11 U.S.C. § 29, to avoid a con-

veyance which is allegedly fraudulent under New York law as to creditors of Haupt. § 70(e) provides that an action must be brought "within two years subsequent to the date of adjudication or *within such further period of time as* the Federal or *State law may permit* . . . ." (emphasis added). Here, the state law on which the trustee relies, Article 10 of the New York Debtor and Creditor Law, carries a six year limitation period, New York CPLR § 213, and this action was brought within six years after the conveyance allegedly occurred. Herget v. Central National Bank & Trust Co., 324 U.S. 4, 65 S.Ct. 505, 89 L.Ed. 656 (1945), on which defendant principally relies, is expressly made inapplicable to claims asserted by the trustee, save those causes of action generated by the Act itself in § 60.

Defendant complains that it has just now learned for the first time that plaintiff relies on *state* law to avoid the transfer, and that it was misled by § 64 of the amended complaint which states that " . . . the transfer of $12,000,000 made or suffered by Haupt to the Association is fraudulent against creditors of Haupt and *null and void under applicable provisions of federal laws*" (emphasis added). To be sure, the italicized phrase is ambiguous, but it is reasonable to assume that "applicable provisions of federal laws" refers to § 70(e). Indeed, the very first paragraph of the amended complaint states that plaintiff seeks to avoid the transfer under § 70(e), which necessarily implies reference *outside the Bankruptcy Act* to federal or state substantive law. In any event, defendant has not demonstrated that it has been prejudiced by its misapprehension of the law plaintiff seeks to apply.

### Association as Transferee

The Clearing Association points out that the variation margin it received from Haupt was not retained for its own use, but rather was immediately conveyed to other Clearing members. It therefore seeks to absolve itself from liability, citing United States v. Cambridge Trust Co., 300 F.2d 76 (1st Cir. 1962), for an "old and well established principle [of agency] . . . that a known agent who receives money paid to him by mistake is protected from liability if innocently and in good faith he has paid the money over to his principal before receipt of notice of the payor's mistake. [citations omitted]." *Id.*, at 78. Even if *Cambridge Trust Co.*, which involved an attempt to recover from a collecting bank excess amounts paid on altered postal orders, is apposite, defendant has not demonstrated that Haupt's payment of variation margin was a "mistake," or that the Clearing Association had an agency relationship with the clearing members to whom the $12 million was conveyed. Absent such a showing, summary judgment is inappropriate.

### The Assets Transferred

Defendant Exchange suggests that the $12 million in variation margin was in reality *Allied's* money, delivered by Allied to Haupt, and deposited by Haupt for Allied's account. The record discloses however, that Haupt borrowed nearly all of the $12 million from banks and paid it directly to the Association, and that subsequent to November 13, 1963, Haupt received no funds from Allied. Moreover, Haupt, like all Clearing members, was itself primarily and solely responsible for meeting variation margin calls. Had Haupt defaulted on this obligation, the Association could not have proceeded against Allied. Clearing Association By-laws, §§ 23, 26, 27. Thus, defendant's assertion appears to be unfounded.

### Fair Consideration

Defendants further contend that as a matter of law they did not violate the provisions of New York's Debtor and Creditor Law on which plaintiff relies. Section 273 provides, in pertinent part:

"Every conveyance made . . . by a person who is or will be rendered thereby insolvent is fraudulent as to

creditors without regard to his actual intent if the conveyance is made . . . without a fair consideration."

Section 274 provides, in pertinent part: "Every conveyance, made without fair consideration when the person making it is engaged . . . in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors . . . without regard to his actual intent."

Section 275 provides, in pertinent part: "Every conveyance made . . . without fair consideration when the person making the conveyance . . . intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

The main thrust of defendants' argument is that "fair consideration" was given in exchange for Haupt's transfer of $12 million to the Clearing Association. Section 272 states, in part, that fair consideration is given for property "[w]hen, in exchange for such property, . . . as a fair equivalent therefore, and in good faith, . . . an antecedent debt is satisfied . . . ." Defendants submit that the Association's clearing and variation margin rules in effect created an antecedent debt which Haupt's transfer satisfied. *See* Association By-laws, §§ 19 and 23. However, no authority has as yet been submitted to support such a characterization. Moreover, the very creation of the "debt," if debt it be, constitutes the pivotal transaction challenged herein, and the *bona fides* of that creation is at issue.

### Insolvency

Nothing in the record suggests that Haupt, at the time of the transfer, questioned the validity of the warehouse receipts it accepted as collateral from Allied. Thus, there has been no showing that Haupt "intend[ed] or believe[d]

that [it would] incur debts beyond [its] ability to pay as they mature," and plaintiffs announced intention to rely on § 275 appears misdirected.

The Clearing Association insists that Haupt was not insolvent at the time of the transfer, nor rendered so by it. "A person is insolvent," under § 271, "when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." Defendant maintains that at the time of the transfer Haupt was solvent because its assets included a $12 million "receivable" from Allied, fully secured by warehouse receipts and entitled to asset valuation at full face value. However, this issue— whether as a matter of law or on the undisputed facts of this case the "present fair salable value" of Allied's obligation to Haupt equals face value—has not yet been properly framed by the parties. Accordingly, defendant's motion, insofar as it is premised on that proposition, is denied without prejudice to its subsequent renewal.

### Liability of the Exchange

The Exchange was neither the transferee of the variation margin, nor the transferee's grantee. Thus, liability if it exists must be premised on the principle enunciated in Board of Trade v. Wallace, *supra*, that the act of a clearing house is, in certain circumstances, deemed to be the act of the contract market with which it is affiliated. Neither party has directed its attention to whether the principle should be applied to the routine clearance of contracts, or to whether the formally independent but functionally interdependent relationship existing between the Clearing Association and the Exchange is substantially similar to the relationship which existed in *Wallace*. Accordingly, the Exchange's motion is denied without prejudice to its subsequent renewal.

### CONCLUSION

To recapitulate, as to Count One the motions of defendants Fahnestock,

Clearing Association, Weinstein, and Boyer are granted in all respects. The motions of defendants Fashena and Usiskin are granted only as to the bad faith allegation. The motions of defendants Exchange, MacDonald, Anderson, Merrill Lynch, Klein, Bunge, Vogel and Continental are denied. As to Count Two, the motions of defendants Fahnestock, Clearing Association, Weinstein, Boyer, Fashena, and Usiskin are granted in all respects. The motions of defendants Exchange, MacDonald, Anderson, Merrill Lynch, Klein, Bunge, Vogel and Continental are denied. As to Count Three, the motions of defendants Exchange and Clearing Association are denied.

So ordered.